ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**SEP 30 2016**

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FIVE ON FIFTY, LLC; GATE INDUSTRIES, LLC; and SOUTHERN FILM REGIONAL CENTER-ATLANTA, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> F. RAYMON BEAN; DAVID SHAFFER; JEFFREY KUEHR; GREENFUELS ENERGY, LLC; GEORGIA RENEWABLE POWER, LLC; GRP FRANKLIN, LLC; GRP MADISON, LLC; GRP NORTH CAROLINA, LLC; NORTH CAROLINA RENEWABLE POWER-LUMBERTON, LLC; and NORTH CAROLINA RENEWABLE POWER-ELIZABETHTOWN, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. <br><br> **JURY DEMAND** <br><br> **1: 16 - CV - 3690** |

## COMPLAINT

Plaintiffs Five on Fifty, LLC; Gate Industries, LLC; and Southern Film

Regional Center-Atlanta, LLC (collectively, "Plaintiffs") hereby file this Complaint

against Defendants F. Raymon Bean; David Shaffer; Jeffrey Kuehr; GreenFuels

Energy, LLC; Georgia Renewable Power, LLC; GRP Franklin, LLC; GRP

Madison, LLC; GRP North Carolina, LLC; North Carolina Renewable

Power-Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC (collectively, "Defendants") and state as follows:

## I.    INTRODUCTION.

1.

Defendants are individuals and entities that hold themselves out as having significant experience in the electrical power generation industry.  Before being introduced to Plaintiffs, Defendants had been pursuing a complex, multi-million dollar business venture that involved acquiring four electrical power plants—two located in northern Georgia and two in southern North Carolina—that would generate revenue by selling electrical power to utilities pursuant to power purchase agreements with those utilities.  The plants were to be modernized to employ technologies that would produce renewable energy from bio fuels, such as wood and chicken waste.

2.

Because Defendants could not fund the entire venture themselves, they needed significant investment of more than $200,000,000.00 and were therefore seeking funding from other sources, when they met Plaintiffs, who have experience and expertise with obtaining funding for EB-5 Projects. (EB-5 Projects are part of the "EB-5" foreign investment program that is overseen by the United States Citizenship

-2-

and Immigration Services ("USCIS").)  EB-5 Projects involve a complex, lengthy, and expensive application process that can take a year or more, whereby an applicant must demonstrate to the USCIS that the underlying business venture for a project will create at least a specified number of jobs in order to attract foreign investment which is demonstrated, *inter alia*, through submission of a detailed business plan supported by an economist's report.

3.

Defendants (individually or through affiliated entities) retained Plaintiffs to apply for, and fund, an EB-5 project for each of the four power plants (collectively, the "Projects").  Because of the large scope of the Projects and the substantial work that would be required for the Projects, Defendants asked Plaintiffs to focus on Defendants' four Projects and to work on them exclusively for an entire year, which Defendants agreed to do, and did, turning down other Projects throughout that period of time.  Plaintiffs were to receive payment for expenses and services necessary to prepare valid applications for each project and then stood to earn significant compensation, in excess of $25 million over a period of years, for their work in raising EB-5 funding the Projects through foreign investment.

4.

Because EB-5 project applications involve serious and complex representations to the USCIS, made under penalty of perjury, Plaintiffs stressed from the outset of their relationship with Defendants that the EB-5 applications must be completely accurate in describing the details of the Projects, to demonstrate to the USCIS that each project would in fact produce enough power and jobs to meet requirements and would be able to support at least $166,000,000.00 in foreign investment in the domestic Projects, as required for USCIS approval.

5.

In hindsight, Plaintiffs now know that Defendants fraudulently induced them into working with Defendants to apply for and seek funding for the Projects by representing that Defendants had the knowledge, assets, and equipment necessary to meet the EB-5 requirements for job-creation and investment. Relying upon Defendants' representations about the cost, operation, output, and revenues associated with each of the Projects, Plaintiffs agreed to set aside all new business and to work exclusively on Defendants' four EB-5 Projects for a year, beginning in November 2014.

6.

As work on the Projects continued over a period of months, however, Plaintiffs

began to discover that Defendants had fraudulently misrepresented (and in some cases

omitted) key facts about the Projects that were to be used in the EB-5 applications for

the Projects, to prove that each project was financially viable and would produce

revenues necessary to fund the underlying business.

7.

For instance, Defendants misrepresented the type and size of a boiler that was a

key part of the Lumberton plant's ability to generate the requisite amount of electrical

power to meet the requirements of a Power Purchase Agreement with Duke Energy, at

a certain cost, and in doing so greatly exaggerated the amount of power that would in

fact be generated.

8.

As another example, Defendants withheld from Plaintiffs that two key

personnel who were overseeing the Projects had quit because of their dissatisfaction

with Defendants' handling of the Projects.

9.

Even after being warned by Plaintiffs about these misrepresentations, Defendants proceeded in bad faith and chose not to pay for updated economic studies and reports that would be necessary to revise the EB-5 applications to reflect the true facts and figures about the Projects.

10.

Another example of Defendants' misrepresentations about the viability of the power Projects is the fact that Defendants have had to stop the operation of the Lumberton plant for extended periods of time, because Defendants have been unable to outfit and operate it within the applicable legal limits for pollution. Furthermore, even when that plant has been operational, it has consistently failed to generate the amount of electricity that Defendants represented that it would, making it unlikely that the Lumberton plant could perform as represented by Defendants in their EB-5 application.

11.

Upon information and belief, Plaintiffs now understand that Defendants have stopped work on the two Projects in Georgia (the Madison and Franklin power plants), because of serious problems making those two plants function at the necessary capacity.

12.

Rather than continuing to work in good faith with Plaintiffs on the Projects, Defendants instead purported to continue working with Plaintiffs to fund the Projects, when Defendants were instead actively soliciting yet another source of funding for the Projects, which Defendants ultimately pursued after suddenly and unilaterally terminating their relationship with Plaintiffs. Defendants ultimately breached their contracts with Plaintiffs and ended Plaintiffs' involvement in the Projects, depriving Plaintiffs of the money that they would have earned from the Projects. Having sought investment in their power Projects from other sources, both before and after they used Plaintiffs for EB-5 financing, it is clear that Defendants' fraudulent activities constitute an interstate enterprise that (i) has committed wire and mail fraud and thus violates Federal and state RICO laws, (ii) has committed fraud, (iii) has breached contracts, and (iv) failed to act in good faith. Therefore, Plaintiffs have filed this action seeking relief for the damage done to them, including lost fees, profits, and other amounts that Plaintiffs will not receive, as a proximate cause of Defendants' fraud, bad faith, and other improper acts.

## II.   PARTIES, VENUE, AND JURISDICTION.

13.

Plaintiff Five on Fifty, LLC is a limited liability company registered in Delaware that is a citizen of Georgia.

14.

Plaintiff Gate Industries, LLC ("Gate Industries") is a limited liability company registered in Delaware that is a citizen of Georgia.

15.

Plaintiff Southern Film Regional Center-Atlanta, LLC ("SFRC") is a limited liability company registered in Georgia.

16.

Defendant F. Raymon Bean ("Bean") is a natural person who, upon information and belief, is a citizen of Alabama.

17.

Defendant David Shaffer ("Shaffer") is a natural person who, upon information and belief, is a citizen of Pennsylvania.

18.

Defendant Jeff Kuehr ("Kuehr") is a natural person who, upon information and belief, is a citizen of Indiana.

19.

Defendant GreenFuels Energy, LLC ("GreenFuels") is a limited liability company registered in Delaware that is a citizen of Alabama. Defendant Bean owns all of Defendant GreenFuels.

20.

Defendant Georgia Renewable Power, LLC ("Georgia Renewable Power") is a limited liability company registered in Delaware that is a citizen of Alabama. Defendant GreenFuels owns all of Defendant Georgia Renewable Power.

21.

This court has personal jurisdiction over the parties to this action for reasons that include *inter alia,* their work performed in the Northern District of Georgia on a large power plant projects.

22.

Defendant Bean is the managing member of Defendant Georgia Renewable Power.

23.

Defendant Shaffer is the president and Chief Operating Officer of Defendant Georgia Renewable Power.

24.

Defendant Kuehr is the Finance Director of Defendant Georgia Renewable Power.

25.

This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367. The current in controversy in this action exceeds $75,000.00, exclusive of interest and costs.

26.

Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) because, *inter alia*, a substantial part of the events or omissions giving rise to this dispute occurred in Georgia, and because a substantial part of the property that is the subject of this action is situated in the Northern District of Georgia.

27.

Venue is also proper as to Defendants, pursuant to 18 U.S.C. § 1965, based on their work on power plant projects in the Northern District of Georgia.

28.

Additionally, numerous of the Defendants (individually and through their affiliates) are parties to four separate "Engagement Agreements" (one for each EB-5 power plant project), each of which contains a venue and choice of law provision

which states that Georgia law applies, and that the parties have agreed that "[a] suit, action or proceeding arising out of or relating to [the] Agreement may be maintained in any court of competent jurisdiction in Fulton County, Georgia, and each party waives all objections to such jurisdiction and venue." (True and correct copies of these four Engagement Agreements are attached hereto as Exhibits "A"-"D" (collectively, the "Engagement Agreements").)[1]

## III.  BACKGROUND FACTS.

### A.  Defendants Are Affiliated Persons and Entities Who Were Collectively Seeking to Fund a Business Venture That Involved the Production of Electrical Power Using Biomass Materials at Four Power Plants Located in Georgia and North Carolina.

29.

Before Defendants were introduced to Plaintiffs, Defendants had formed a venture involving the production of electrical power at four power plants, located in (i) the City of Madison, Georgia, (ii) the Village of Franklin, Heard County, Georgia, (iii) the City of Lumberton, North Carolina, and (iv) the Town of Elizabethtown, Bladen County, North Carolina. (Defendants had initially explored acquiring a power

---

[1] Out of an abundance of caution, Plaintiffs are seeking to file the exhibits under seal, because some contain confidential information.

plant in the City of Jefferson, Georgia, but opted instead to acquire a power plant in the City of Madison.)

30.

As part of the venture, each of the power plants was to be modernized so that each could produce renewable energy to be generated from bio fuels, including wood pulp and chicken waste.

31.

Achieving profitable and sustainable levels of electricity from biofuels requires substantial expertise in a niche area of power production and the use of new and expensive technologies. Among other things, biofuels create substantially more moisture than traditional coal plants and thus do not produce energy as efficiently as do traditional, coal-burning power plants. Therefore, being able to attract investors and funding for biofuel power projects requires a strong and supportable business plan to demonstrate that a plant can produce the required amount of electrical power at an overall cost that will allow the plant to operate at a specified project level.

32.

Before Defendants were introduced to Plaintiffs, Defendants had been seeking investment financing for their venture from other sources. In materials associated

with that financing, the relationship of the entities involved in Defendants' venture was listed as follows:[2]



---

[2] Plaintiff did not work directly with Power Fiber, LLC, with GRP Finance Corp. or GreenFuels International, LLC. Plaintiffs are aware, however, that GreenFuels Energy, LLC and GreenFuels International, LLC are currently being sued for allegedly taking another party's business opportunity in violation of a non-circumvention agreement regarding a biofuel-powered project in Ireland. *See MUN Associates, Inc., et al. v. GreenFuels Energy, LLC*, United States District Court for the District of New Jersey, Newark Division, Case No. 2:16-cv-04859-ES-JAD. In addition, Defendants Georgia Renewable Power and GreenFuels are currently being sued un this Court regarding their alleged nonpayment of $3,000,000.00 allegedly owed by them on a Purchase and Sale Agreement concerning the power plant in Franklin, Georgia, that is part of the Franklin Project. *See SEA Green Energy Partners, LLC v. Georgia Renewable Power, LLC and GreenFuels Energy, LLC*, United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:16-cv-03617-CAP.

33.

In an attempt to acquire financing for the four Projects that comprise Defendants' overall venture, Defendants engaged in interstate communications with Plaintiffs (primarily Gate Industries), beginning in approximately July or August 2014. These discussions involved obtaining financing for the Projects through foreign investment via the EB-5 Immigrant Investor Program overseen by the USCIS. (The Immigrant Investor program was created under the Immigration Act of 1990. The Regional Center Pilot Program was added as part of changes adopted in 1993.)

34.

Many of the parties' communications occurred via interstate email, mail, and telephone calls, given that Defendants predominantly work out of Alabama, that Plaintiffs operated out of Georgia and South Carolina, and that the subject power plants are located in Georgia and in North Carolina.

35.

Defendants' continuing use of the entities and persons who pursued the Projects, as well as improper practices related to the funding of the Projects, is evidenced by facts including Defendant Shaffer's own letter, dated March 29, 2016, to Plaintiff Gate Industries that unilaterally ended Defendants' relationship with Plaintiffs. Specifically, Defendant Shaffer sent that letter under the subject line,

"GreenFuels Energy, LLC and Affiliates ('GreenFuels')," after which he stated, "[t]hank you for your interest in working with GreenFuels and its affiliates in connection with the sourcing of debt and/or equity sources to facilitate the financing, construction and operation of GreenFuels' biomass facilities and Projects." Defendant Shaffer then advised that "GreenFuels has recently entered into an exclusive arrangement" with another entity regarding "financing and financial structuring." Defendant Shaffer copied Defendant Bean and Defendant Kuehr on his letter. (A copy of that letter is attached hereto as Exhibit "E.")

## B. Plaintiffs Provide Services Related to EB-5 Projects.

36.

Plaintiffs are related businesses that work together on EB-5 Projects—to assist in the preparation of the complex applications, and, upon approval by the USCIS, to assist clients in seeking foreign investment in these EB-5 Projects through foreign brokers and agents abroad.

37.

EB-5 Projects are part of the government sponsored EB-5 Program, which promotes job creation in the United States through foreign investment and allows certain qualified foreign investors to obtain green cards that allow them to live and work in the United States.

38.

The EB-5 process includes three major steps: (i) application to the USCIS for approval of a project; (ii) solicitation of foreign investment to fund a project (which continues after USCIS approval); and (iii) approval of the application by the USCIS.

39.

In order for an EB-5 project to be approved by the USCIS, an applicant must file a lengthy and complex application which shows, *inter alia*, that the related project is a viable business opportunity that will create at least a specific number of jobs in a particular geographic area and thereby generate at least a certain level of foreign investment.

40.

Preparing an application for a single EB-5 project can take up to, or more than, a year and can cost well over $200,000.00. Among other things, this is because EB-5 applications require the retention and use of a number of third-party professionals such as immigration and securities lawyers, economists, accountants, consultants, migration brokers and others.

41.

EB-5 applications must include an economist's report and a detailed business

plan to demonstrate to the USCIS that the underlying business venture is viable and

will create the required number of jobs and investment.

42.

Applicants seeking approval of an EB-5 project must certify that all information

contained in an application is correct, under penalty of perjury.

43.

For example, the USCIS "Form I-924" that must be submitted with an EB-5

application includes the following "instructions":

By signing this form, you have stated under penalty of perjury
(28 U.S.C. 1746) that all information and documentation submitted with
this form is true and correct. You also have authorized the release of any
information from your records that USCIS may need to determine
eligibility for the benefit you are seeking and consented to USCIS
verification of such information. Agency verification methods may
include but are not limited to: review of public records and information;
contact via written correspondence, the Internet, facsimile, or other
electronic transmission or telephone; unannounced physical site
inspections of residences and places of employment; and interviews.
Information obtained through verification will be used to assess your
compliance with the laws and to determine your eligibility for the benefit
sought.

44.

Similarly, the USCIS "Form I-924a" that must be submitted by a Regional

Center to verify the progress of an EB-5 Project includes the following language:

I certify, under penalty of perjury under the laws of the United States of
America, that this form and the evidence submitted with it are all true
and correct. I authorize the release of any information from my records
that U.S. Citizenship and Immigration Services needs to determine
eligibility for the benefit being sought. I also certify that I have authority
to act on behalf of the Regional Center.

45.

The accuracy of information submitted in an application to the USCIS is

especially important, because recent high profile episodes of fraud related to EB-5

Projects have resulted in large sanctions and have heightened USCIS attention to the

representations made in EB-5 applications.

46.

Once an EB-5 application is submitted, a project can proceed, including

solicitation of foreign investment to fund the approved project. Only submission of a

Project Application is needed to market the Project and take investor funds into

escrow. USCIS approval is not necessary to begin marketing a Project.

-18-

## C.    Defendants Engaged Plaintiffs to Apply for and Fund an EB-5 Project for Each of the Four Power Plants in Georgia and North Carolina.

### 47.

On or about July 1, 2014, certain of Defendants engaged Plaintiffs to apply for and upon submission of application to fund an EB-5 project for each of the four power plants in Georgia and North Carolina that were part of Defendants' overall venture to make money through the generation and sale of electric power to utility companies, using biomass materials.

### 48.

Due to the great size and complexity of each of the Projects, which involved details and logistics concerning the modernization and operation of each power plant, and the amount of investment being sought, Plaintiffs explained to Defendants the substantial amount of time, effort, and expense that would be involved in preparing the EB-5 applications and, thereafter, seeking funding of the Projects.

### 49.

In response, Defendant Shaffer repeatedly asked Plaintiffs (in the presence of others) to work exclusively and only on Defendants' applications for the four power plant Projects for one year. Plaintiffs agreed and honored that request by working

4849-0824-8118.5                                      -19-

exclusively on the Projects for a year, foregoing other business opportunities as a result.

### 50.

On July 1, 2014, GreenFuels and its affiliates entered into four essentially identical "Engagement Agreements" with Gate Industries and SFRC–ATL for each of the four Projects. Defendant Shaffer signed the Engagement Agreements, copies of which are attached hereto as Exhibits "A"-"D."

### 51.

Each of the Engagement Agreements included as attachments both (i) a "Critical Path and Timeline" that outlined the phases required to prepare a final application to the USCIS, and (ii) a chart summarizing the significant "Estimated Expenses" that would be required for the application process.

### 52.

The "Critical Path and Timeline" described the five "Phases" of the EB-5 application process, ending with "Phase V" which concluded with submission of an application for each of the Projects to the USCIS for consideration and approval.

### 53.

Sections 9 and 10 of the Engagement Agreements specified the types of information that Defendants would need to provide for the Projects and the

information that would be provided to the USCIS in regard to them. In addition,

Plaintiffs made clear that other information about the Projects must be accurately

reported to the USCIS.

54.

Because of the importance of providing accurate and complete information to

the USCIS in regard to the Projects (under penalty of perjury), Defendants agreed as

follows in the Engagement Agreements:

REPRESENTATIONS BY THE CLIENT. The acts, statements and representations made by or on behalf of the Client to prospective foreign investors or other transaction counterparties about the Client or the Project, including but not limited to representations in the Business Plan, Private Placement Memorandum or other offering documents, *are the sole responsibility of the Client and the Client agrees to indemnify the Regional Center* and its officers, directors, members, managers, employees, attorney, and agents *for any liability, claims, losses and expensed, including legal expenses, incurred by the Regional Center that result from any of the Client's acts, statements and representations about the Client or the Project.*

(Engagement Agreements (Exhibits "A"-"D"), § 15 (emphasis added).)

55.

As the parties continued to work together to apply for and fund the Projects,

Plaintiffs and certain of Defendants memorialized the steps and terms for funding the

Projects, by executing a detailed "Term Sheet," dated April 6, 2015, a copy of which

is attached hereto as Exhibit "F." The Term Sheet incorporated as part of its terms an

attached "Project Checklist for Team of Professionals" (the "Term Sheet Checklist").

56.

The Term Sheet included as a party, Defendant Gate Industries "or an affiliate

or subsidiary thereof," all of which are collectively defined as the "New Commercial

Enterprise or NCE" in the Term Sheet. Section II, on page 5 of the Term Sheet,

identified Defendant Five on Fifty, LLC in relation to Gate Industries' work as the

"NCE."

57.

As stated on the first page of the Term Sheet, the Term Sheet concerned the

funding of the Projects, and identified as the "Lender" the following Defendants:

GRP Franklin, LLC; GRP Madison, LLC; North Carolina Renewable Power-

Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC.

58.

The continuity of the Term Sheet in regard to the parties' ongoing work being

performed to apply for and then fund the Projects is evident from the detailed Term

Sheet Checklist, which like the Engagement Agreements, contained a detailed

explanation of the numerous "Phases" involved in the EB-5 process for each of the

Projects.

59.

Before the parties' relationship would end due to Defendants' abrupt termination of its relationship with Plaintiffs, the parties had completed the first three of the four Phases listed in the detailed Term Sheet Checklist, and Plaintiffs had already taken significant steps toward, and invested considerable time and effort in, completing the final, fourth Phase which concerned the funding of the Projects.

60.

Plaintiffs were especially interested in funding the Projects because it was the funding phase of each Project through which Plaintiffs would receive substantial payments, including a percentage of all investment and related fees for work regarding the financing. This future stream of payments was one of the main reasons that Plaintiffs agreed to work exclusively on Defendants' Projects for a year.

**D.** **After Working Diligently and Exclusively for Months to Apply for And Fund the Projects, Plaintiffs Began to Encounter Problems Receiving Accurate and Prompt Information About Key Aspects of The Projects That Was Vital to Approval and Funding of the Projects.**

61.

Because each of the four power plants involved in the four Projects was the sole source of profits and job-creation necessary for obtaining EB-5 approval and,

subsequently, the necessary level of foreign investment, the details about the operation and performance of each power plant were critical.

62.

Each of the four power plants would produce revenue by supplying electrical power to the applicable local power utility (here, Georgia Power for the Georgia power plants, and Duke Energy for the North Carolina power plants). The terms of each plant's supply of power to each utility was governed by a separate power purchase agreement (commonly referred to as a "PPA"). Accordingly, the PPA for each plant dictated, among other things: (i) the amount of electrical power that a plant had to supply to the utility; (ii) the deadline by which the power plant had to be able to produce that amount of power; and (iii) the price to be paid by the contracting utility for that amount of power.

63.

The PPA for each plant also contained a significant liquidated damages provision that required the entity operating a power plant to pay liquidated damages, if a plant was not fully operational by the contracted deadline.

64.

Therefore, the viability and success of each of the Projects depended entirely on Defendants' ability to bring each plant online and to produce the required level of electrical power by the required deadline, and at a profitable cost.

65.

Among other things, assumptions about these facts were a key part of the EB-5 application for each of the Projects, as well as to attracting the required level of investment that would be necessary to fund the Projects.

66.

Because of the size and complexity of the four power plants at issue, Plaintiffs were largely dependent upon the expertise and communications of Defendants, and their contractors and consultants, for knowing that the representations in the EB-5 applications for each of the Projects were accurate and realistic.

67.

For example, one key element of, and assumption for, each of the Projects was the type of equipment to be used at each power plant. This was especially important for the Projects, because they all involved reconfiguring older, coal-burning plants to produce power from biofuels using modern, high tech equipment.

68.

For example, a key part of the plan for the Lumberton Plant was to replace an antiquated boiler there with a modern, $70,000,000.00 Andritz Group boiler that was capable of generating the necessary amount of heat and hence power output using biofuels. Consequently, using the new boiler was a key part of the plan for operating that project at a level that would be consistent with representations being made and the related EB-5 application, such that the Lumberton project would meet the job-creation and investment requirements for that project.

69.

Although Defendants were aware that the EB-5 application documents for the Lumberton project continued to assume the use of such a new boiler, Defendants ultimately decided (on their own and without promptly informing Plaintiffs) against replacing the boiler, as initially planned.

70.

Defendants did not promptly communicate this decision to Plaintiffs. Consequently, as the September 2015 deadline approached to finalize the EB-5 application for the Lumberton (and other) Projects, Plaintiffs became concerned and requested (through interstate communications) that Defendants pay to have certain reports revised about the assumptions and expectations about the Lumberton Project,

because it was clear that the change in the boiler (along with other changes) would reduce the performance and output of the Lumberton power plant and would affect key EB-5 terms including job-creation numbers for that plant.

71.

Plaintiffs therefore requested that Defendants pay to have the necessary reports revised, but Defendants, speaking through Defendant Schaffer, refused – even though certain members of Defendants' own team questioned how Defendants could proceed with the EB-5 application process, based on old and inaccurate data. Among other things, Defendant Schaffer stated that he did not want to pay an added expense for revisions to the reports used in the EB-5 application.

72.

As time passed while Plaintiffs continued to work exclusively on the Projects for Defendants, Plaintiffs came to learn—belatedly—about other problems with the Projects, including but not limited to the Lumberton Project.

73.

For example, even though Plaintiffs subsequently came to learn about a diligence report, dated August 10, 2015, that outlined numerous discrepancies and concerns about the representations about the Projects being made in the EB-5 applications, Plaintiffs did not become aware about that report, or many of the

problems discussed in it, until late February 2016, when Plaintiffs eventually received a copy of it. Significantly, although Defendants had, and were aware of, that report at least one month before the EB-5 applications had to be finalized, Defendants did not attempt to inform Plaintiffs about the report or its contents, until many months later.

74.

The significant effects of Defendants' misrepresentations and material omissions about the configuration and operation of the Projects are evident from Defendants' inability to proceed with them.

75.

Upon information and belief, although the PPA for the Lumberton Power Plant called for the generation of at least 35 megawatts of power, that plant has been unable to generate more than approximately 20 megawatts, which level could only be maintained for a short period of time, due to problems with ash buildup caused by the burning of biofuels.

76.

Furthermore, and upon information and belief, Defendants have not been able to operate the Lumberton Plant at all for significant periods of time, because Defendants have continually exceeded the permissible level of emissions, which has required shutdowns so that the plant could stay within the applicable pollution limits.

4849-0824-8118.5                          -28-

77.

In addition and upon information and belief, Defendants' inability to operate the two Georgia plants at necessary levels of power production, have caused Defendants to stop operations at those plants, as well.

78.

Although Defendants knew and/or should have known (for a considerable amount of time) about the problems that have significantly and adversely affected the operation of the power plants, Defendants chose to keep Plaintiffs in the dark, as Plaintiffs continued to work, exclusively and for months, on the Projects.

79.

Another key misrepresentation and omission of Defendants with regard to Plaintiffs' work on the Projects concerns the continued involvement and employment of persons identified by Defendants as "key personnel" for the success of the Projects.

80.

Defendants' solicitations, disclosures and other materials used to seek involvement and investment in the Projects have routinely stressed that the Projects were being overseen by key personnel with significant experience in the power production industry, in general, and with power generated from biofuels, in particular.

These personnel have included Chris Colucci and Terry Williams (collectively the "Key Personnel").

### 81.

In or around the last quarter of 2015, as Plaintiffs grew concerned about the accuracy and completeness of information about the Projects, Nic Applegate, acting on behalf of Plaintiffs, began to inquire with Defendants about the continuing involvement of the Key Personnel on Projects. Mr. Applegate was curious because the Key Personnel had not been appearing in ongoing communications about the Projects at that time, as they had been doing before.

### 82.

When Mr. Applegate specifically asked Defendant Kuehr about the status of the Key Personnel with respect to the Projects, Defendant Kuehr falsely advised that they were still involved and knowingly failed to disclose to Plaintiffs that the Key Personnel had actually quit working for the Projects – more than a month before, as Plaintiffs would subsequently learn from another, unrelated source.

### 83.

Defendants' hiding of material facts regarding the continued involvement of the Key Personnel is yet another fraudulent representation about the Projects, made

through interstate commerce, on which Plaintiffs relied in deciding to continue their work, exclusively, on the Projects for Defendants.

84.

Upon information and belief, the Key Personnel both voluntarily chose to quit and leave the Projects because of their concerns about Defendants' ability to properly configure and operate the Projects, as well as related concerns about maintaining their reputations in the electrical-power-generation industry, because of missteps by Defendants.

85.

As the parties reached the September 2015 deadline to finalize the EB-5 applications for the Projects, Plaintiffs became concerned about the accuracy and completeness of the information being provided by Defendants about the Projects. These concerns were heightened by Defendants' continued refusal to pay the relatively insignificant costs required to have economists and others update their reports so that the EB-5 applications were accurate and current for each of the Projects.

86.

Interstate emails between the parties demonstrate that even certain financial persons working on the Projects for Defendants had questioned how Defendants could

proceed with the EB-5 applications, without revisions to reflect numerous changes, as had been directed by Defendant Schaffer. However, Defendants ultimately chose not to pay for, or make, the related changes. Among other things, Defendants communicated their decision not to revise the EB-5 application documents through interstate phone calls between Defendant Schaffer and Mr. Applegate, acting on behalf of Plaintiffs.

87.

Plaintiffs' concerns about the accuracy and completeness of Defendants' disclosures about the Projects increased further, in approximately January 2016, when Plaintiffs received an anonymous phone call expressing concerns about the accuracy of the information that Defendants had supplied.

88.

On January 31, 2016, Mr. Applegate, acting on behalf of Plaintiffs, sent a letter to Defendants, care of Defendant Bean, noting Plaintiffs' concerns about the accuracy of the information that Defendants had supplied and approved for inclusion in the EB-5 applications for the Projects. (A copy of this letter is attached hereto as Exhibit "G.")

89.

In February and March 2016, Mr. Applegate had numerous interstate telephone conversations with Defendant Bean about the Plaintiffs' concerns about the Projects. Defendant Bean, in calls made to Mr. Applegate, assured Plaintiffs that Defendants would continue working with Plaintiffs on the Projects and that Defendants would cure any problems with information on the applications. Defendant Bean's representations proved to be false and were part of Defendants' continuing pattern of fraud and misrepresentations about the Projects, aimed at having Plaintiffs continue working on the Projects–at least until Defendants could find another source of funding for the Projects.

90.

Then, on March 29, 2016, Defendant Schaffer sent a letter to Plaintiffs, through interstate commerce, on behalf of "GreenFuels Energy, LLC and Affiliates" unilaterally terminating Defendants' relationship with Plaintiffs. Mr. Schaffer provided no explanation for this sudden move, other than to advise that Defendant GreenFuels, LLC and affiliates had "recently entered into an exclusive arrangement with a strategic partner" to provide services "relating to financing and financial structuring." (A copy of Mr. Schaffer's letter is attached hereto as Exhibit "E.")

## COUNT I
## (RICO 18 U.S.C. § 1962(c))

### 91.

Plaintiffs hereby incorporate by reference Paragraphs 1-90 of this Complaint.

### 92.

Defendants are all culpable parties and, together, constitute (and constituted) an enterprise engaged in, and whose activities affect, interstate commerce.

### 93.

Defendants' enterprise involved making fraudulent statements and other misrepresentations that were intended to induce other persons and entities, including Plaintiffs, into investing in and/or seeking investment in the Projects, through EB-5 financing and other means of financing.

### 94.

Defendants' enterprise included their efforts to obtain financing for the Projects done before Defendants' engaged Plaintiffs, and it has continued after Defendants unilaterally terminated their relationship with Plaintiffs, as evidenced by Defendant Shaffer's March 29, 2016, mailed and emailed to Plaintiffs, in which he advised that Defendants were moving on to yet another, third-party provider of investment financing for the Projects. (*See* Exhibit "E" to Complaint.)

95.

Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

96.

Defendants' conducted and participated in the enterprise via fraudulent interstate mail, email, and telephone calls, which is consistent with the fact that the enterprise related to large power plants located in Georgia and in North Carolina, and entities and persons located in Alabama, Georgia, North Carolina, South Carolina, and the Southeastern United States.

97.

Defendants' participation in interstate communications made in furtherance of their enterprise is evidenced in the communications attached as Exhibits "A - G" hereto as well as by the following communications (all of which are hereby incorporated by reference):

a.     On February 23, 2015, at 2:05 p.m., Defendant Shaffer sent an email to Nikki Weiner and Nic Applegate, an agent of Plaintiffs, copying Defendant Bean, regarding information needed for preparation of the EB-5 applications for the Projects, in which he referenced the use of

prior disclosures that had been used in connection with the enterprise. (A copy of this email is attached hereto as Exhibit "H.")

b.    On February 23, 2015, at 5:20 p.m., Nic Applegate, on behalf of Plaintiffs, sent an email to Defendant Bean regarding the status of the EB-5 applications for the Projects in which he noted delays and difficulty in obtaining accurate information from GRP and others for those applications.    (A copy of this email is attached hereto as Exhibit "I.")

c.    On February 23, 2015, at 11:45 a.m., Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Defendant Bean and Defendant Shaffer that included an attached checklist regarding the status of the applications for the Projects and that identified certain discrepancies regarding data for the Projects needed for the related applications. (A copy of this email is attached hereto as Exhibit "J.")

d.    On February 24, 2015, at 10:15 a.m., Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Defendant Bean and Defendant Shaffer that circulated a checklist of issues to be addressed regarding the applications for the Projects. (A copy of this email is attached hereto as Exhibit "J.")

e.   On August 3, 2015, at 9:26 a.m., Defendant Kuehr sent an email to persons including Defendant Shaffer, as well as Lowell Elliott, on behalf of Plaintiffs, that included a detailed list of information needed for, and outstanding tasks to be done for, the applications for the Projects. (A copy of this email is attached hereto as Exhibit "K.")

f.   On August 3, 2015, at 12:52 p.m., Defendant Kuehr sent an email to Nic Applegate and Nikki Weiner, responding to issues listed in the email referenced in the preceding paragraph of this Complaint. (A copy of this email is included in the chain of emails attached hereto as Exhibit "K.")

g.   On August 5, 2015, at 5:17 p.m., Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Dennis Carroll of Defendant GreenFuels Energy, LLC and Defendant Georgia Renewable Power, LLC; Defendant Shaffer; and Defendant Kuehr, in which Ms. Weiner that addressed concern about Defendants' continuing failure to provide promised information that was then urgently needed in order to prepare accurate applications for the Projects. (A copy of this email is included in the chain of emails attached hereto as Exhibit "L.")

h.   On August 6, 2015, at 7:40 a.m., Defendant Shaffer sent an email to others including Dennis Carroll, Nikki Weiner, and Nic Applegate, in

which Defendant Shaffer acknowledged the issues raised in the email identified in the preceding paragraph of this Complaint. (A copy of this email is included in the chain of emails attached hereto as Exhibit "L.")

i.     On August 10, 2015, at 4:31 p.m., Nikki Weiner, on behalf of Plaintiffs, sent an email to Defendant Kuehr, in which she expressed concern about accurately describing the jobs to be created by the projects, given that revised data suggested a decrease in the number of jobs that were supposed to have been created by the Projects. (A copy of this email is included in the chain of emails attached hereto as Exhibit "M.")

j.     On August 11, 2015, at 5:29 p.m., Defendant Kuehr sent an email to persons including Nikki Weiner, Nic Applegate, Lowell Elliott, Dennis Carroll, and Defendant Shaffer. In this email, he forwards an earlier email identifying issues about the accuracy of being provided for the applications for the Projects and recommended to Defendant Shaffer that they should therefore revise certain reports for the Projects, as well as recognizing other outstanding issues regarding the provision of complete and accurate information to Plaintiffs about the Projects. On August 12, 2015, Defendant Kuehr forwarded that email to Defendant Shaffer, with a comment recommending revising project reports. Defendant Shaffer

responded by email on August 12, 2015, at 10:37 a.m., which response
was forwarded by Defendant Kuehr to Nic Applegate, Nikki Weiner, and
Defendant Shaffer. (Copies of these emails are included in the chain of
emails attached hereto as Exhibit "M.")

k.   On August 17, 2015, at 3:35 p.m., Defendant Kuehr sent an email to
     persons including Defendant Shaffer, Dennis Carroll, Nic Applegate, and
     Lowell Elliott, in which he requested copies of certain agreements
     regarding the Projects, which was one of many opportunities that
     Defendants had to see that certain of the facts and information contained
     in those agreements were not consistent with facts presently known to
     Defendants. (A copy of this email is included in the chain of emails
     attached hereto as Exhibit "N.")

l.   On September 2, 2015, at 9:45 a.m., Defendant Kuehr sent an email to
     Nic Applegate and others acting on behalf of Plaintiffs, regarding the
     scheduling of a telephone conference call with Defendant Shaffer, at
     which the parties would address continuing, open issues regarding
     information needed for the EB-5 applications for the Projects. (A copy
     of this email is included in the chain of emails attached hereto as
     Exhibit "O.") Within a week of this email, the parties engaged in one of

many interstate telephone calls made between agents of Plaintiffs and agents of Defendants during which Defendants continued to discuss and supply data for the applications for the Projects, much of which was inaccurate and thus misstated the profitability and job-creation of the Projects.

m. On September 7, 2015, Nic Applegate, acting for Plaintiffs, sent emails to a person at Capital Peak Asset Management, in which he provided information about, and sought interest in providing investment financing for, the Projects for Defendants. On September 21 2015, at 2:41 p.m., Mr. Applegate forwarded this information to Defendant Kuehr as part of Plaintiffs' continuing efforts to assist Defendants with obtaining needed financing and investment in the Projects. (Copies of these emails are included in the chain of emails attached hereto as Exhibit "P.")

n. On November 8, 2015, at 2:54 p.m., Defendant Kuehr sent an email to persons including Defendant Shaffer and Nic Applegate, discussing a need for updated information for information reported in a report contained in an EB-5 application for one of the Projects, in which Defendant Kuehr also acknowledges work by Mr. Applegate, on behalf of Plaintiffs, to obtain investment financing for the Projects from a

specific funding source. (A copy of this email is attached hereto as Exhibit "Q.") (Despite these and other continuing communications regarding Plaintiffs' difficulty obtaining accurate data regarding the Projects, Defendant Shaffer ultimately chose not to incur the relatively minor costs associated with having professionals assisting with the Projects revise their reports so that the applications would be accurate.)

o.   On December 21, 2015, at 12:20 p.m., Defendant Kuehr sent an email to persons including Nic Applegate and Lowell Elliott, which email forwarded other, recent emails regarding Plaintiffs' continuing efforts to obtain investment financing for the Projects from another source. (A copy of this email is attached hereto as Exhibit "R.")

p.   On January 31, 2016, Nic Applegate sent a letter by mail and email to Defendants, addressed specifically to Defendant Bean, in which Mr. Applegate (again) stressed the importance of having complete and accurate information reported in the applications for the Projects and concerns about Plaintiffs' continuing inability to obtain such information from Defendants.   (A copy of this email is attached hereto as Exhibit "G.")

q.   On February 22, 2016, at 2:14 p.m., Defendant Kuehr sent an email to persons including Defendant Shaffer, Defendant Bean, Lowell Elliott, and Nic Applegate (which included another earlier email sent to Defendant Kuehr) regarding continuing efforts to obtain complete and accurate information for applications for the Projects. (A copy of this email is attached hereto as Exhibit "S.")

r.   On March 29, 2016, at 10:02 a.m., Defendant Shaffer directed that a letter signed by him, on letterhead identifying him as President and Chief Operating Officer of Defendant Georgia Renewable Power, LLC, which Defendant Shaffer sent expressly on behalf of Defendant "GreenFuels Energy, LLC and Affiliates," by email, to persons including Nic Applegate, Defendant Bean, and Defendant Kuehr. In that letter, as described earlier in this Complaint, Defendant Shaffer attempted unilaterally to terminate Defendants' relationship with Plaintiffs, due to an "exclusive arrangement" that Defendants had entered into with an undisclosed third-party. (A copy of this letter is attached hereto as Exhibit "E.")

s.   On April 15, 2016, Plaintiffs' counsel sent a letter to Defendant Bean reciting in detail the problems and damages that Plaintiffs had sustained

because of Defendants' continuing failure to provide necessary and accurate information, which letter is incorporated by reference and which recites additional emails in which Defendants conducted their fraudulent enterprise. (A copy of this letter is attached hereto as Exhibit "T.")

98.

The acts of mail and wire fraud set forth above and throughout this Complaint constitute a pattern of racketeering activity, pursuant to 18 U.S.C. § 1961(5).

99.

Defendants have directly and indirectly conducted, and participated in, the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

100.

As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages totaling at least $9,000,000.00. In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT II
## (RICO 18 U.S.C. § 1962(b))

101.

Plaintiffs hereby incorporate by reference Paragraphs 1-100 of this Complaint.

102.

Defendants' participated in an enterprise that involved making fraudulent statements and other misrepresentations that were intended to induce other persons and entities, including Plaintiffs, into investing in and/or seeking investment in the Projects, through EB-5 financing and other means of financing. This enterprise included, but was not limited to, using the following entities to attract investment in the Projects: GRP Franklin, LLC; GRP Madison, LLC; GRP North Carolina, LLC; North Carolina Renewable Power-Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC.

103.

Defendants' enterprise was engaged in, and its activities affected, interstate commerce.

104.

Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity, including but not limited to the fraud and misrepresentations made to Plaintiffs and other through interstate wire and mail fraud, as described above in this Complaint.

-44-

105.

The racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

106.

Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

107.

As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property by reasonably relying on representations of Defendants' about the viability, profitability, and other key aspects of the Projects, which reliance caused Plaintiffs to work exclusively for Defendants for a year (during which time Plaintiffs turned away other work and therefore lost profits), to devote money and other valuable resources to applying for, and seeking investment in, the Projects, and to lose substantial fees and payments that Plaintiffs would have received in relation to the Projects, had the Projects been able to proceed.

108.

As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have suffered damages totaling at least $9,000.000.00. In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT III
## (RICO 18 U.S.C. § 1962(d))

109.

Plaintiffs hereby incorporate by reference Paragraphs 1-108 of this Complaint.

110.

As stated above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

111.

Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

112.

As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages totaling at least $9,000,000.00. In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT IV
## (GEORGIA RICO, O.C.G.A. § 16-14-4(a))

113.

Plaintiffs hereby incorporate by reference Paragraphs 1-112 of this Complaint.

114.

As alleged more fully above, Defendants engaged in a pattern of racketeering activity pursuant to which they engaged in multiple predicate acts, including but not limited to O.C.G.A. § 16-8-3 (theft by deception) and violations of 18 U.S.C. § 1961(1)(B) (mail and wire fraud), that have harmed Plaintiffs.

115.

As a direct and proximate result of Defendants' racketeering activities and violations of O.C.G.A. § 16-14-4(a), Plaintiffs have suffered damages totaling at least $9,000,000.00. Plaintiffs are also entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT V
## (GEORGIA RICO, O.C.G.A. § 16-14-4(b))

116.

Plaintiffs hereby incorporate by reference Paragraphs 1-115 of this Complaint.

117.

As alleged more fully above, Defendants constituted and engaged in an enterprise that operated in, and whose activities affected, interstate commerce. Defendants were employed by or associated with the enterprise.

118.

Defendants agreed to, and did, conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, pursuant to which they engaged in multiple predicate acts, including but not limited to O.C.G.A. § 16-8-3 (theft by deception) and violations of 18 U.S.C. § 1961(1)(B) (mail and wire fraud) in violation of O.C.G.A. § 16-14-4(b).

119.

As a direct and proximate result of Defendants' racketeering activities and violations of O.C.G.A. § 16-14-4(a), Plaintiffs have suffered damages totaling at least $9,000,000.00. In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including attorney's fees.

4849-0824-8118.5                                    -48-

## COUNT VI
## (Fraud)

### 120.

Plaintiffs hereby incorporate by reference Paragraphs 1-112 of this Complaint.

### 121.

Defendants knowingly made false representations (and material omissions) to Plaintiffs in an attempt to induce Plaintiffs to work (exclusively for one year) for Defendants on the Projects, including preparation of EB-5 applications for the Projects and seeking investment funding for the Projects.

### 122.

Defendants' false representations include misrepresentations about specific aspects of the complex power plants that were part of the Projects, such as the type of equipment to be used at the power plants, the amount of electrical power and profits that each of the Projects would produce, and the status of key personnel who were working (or continuing to work) on the Projects—including material omissions about the fact that certain key personnel had quit working for Defendants and thus on the Projects.

123.

Defendants knew or should have known that their representations to Defendants were false (and that certain omissions were omissions of material fact), when Defendants made those representations and omissions.

124.

Plaintiffs reasonably and justifiably relied upon Defendants' misrepresentations and omissions by, inter alia, working exclusively to spend time, effort, and money in pursuit of the approval and financing of the Projects, based on what Defendants' had repeatedly represented were viable and profitable projects that would allow Plaintiffs to profit from their work on the Projects.

125.

Plaintiffs have been damaged in an amount exceeding $9,000,000.00 by their reasonable and justifiable reliance on Defendants' misrepresentations, in ways that include, but are not limited to, legal and professional expenses, as well as lost profits and opportunities.

## COUNT VII
## (Negligent Misrepresentation)

126.

Plaintiffs hereby incorporate by reference Paragraphs 1-112 of this Complaint.

127.

Defendants have negligently supplied information to Plaintiffs regarding and in furtherance of the Projects, including but not limited to details about the equipment at the power plants, the capacity of the power plants to produce electrical power, the profitability of the power plants, and the status of key personnel who worked on the Projects.

128.

Defendants have negligently supplied such information to Plaintiffs in an attempt to induce Plaintiffs to work, exclusively, for and with Defendants to apply for and fund the Projects.

129.

Because Defendants made negligent misrepresentations to Plaintiffs for the purpose of inducing Plaintiffs to work, exclusively, on and for the Projects, it was foreseeable to Defendants that Plaintiffs would rely upon those misrepresentations.

130.

Plaintiffs reasonably and justifiably relied upon the negligent misrepresentations made by Defendants.

131.

Plaintiffs have suffered economic injury proximately caused from their reliance upon Defendants' negligent misrepresentations.

132.

Plaintiffs' damages caused by the Defendants' negligent misrepresentations include but are not limited to lost fees, profits, and other amounts, in excess of $9,000,000.00.

## COUNT VIII
## (Breach of Contract)

133.

Plaintiffs hereby incorporate by reference Paragraphs 1-100 of this Complaint.

134.

Defendants contracted with Plaintiffs to receive the benefit of Plaintiffs' experience, knowledge, and services in regard to the application, approval, and funding of the Projects.

135.

As the parties continued work on the Projects—advancing from the preparation of EB-5 applications for the Projects, to submitting those applications for USCIS approval, and seeking funding for the Projects—the parties memorialized the terms of

their relationship by executing numerous individual contracts that, together, memorialized their agreement regarding Plaintiffs' work on the Projects.

### 136.

The parties' contracts include, but are not limited to, the following: (i) the four Engagement Agreements, attached hereto as Exhibits "A"-"D", and (ii) the Term Sheet," attached hereto as Exhibit "F" (collectively the "Breached Contacts").

### 137.

Pursuant to the Breached Contracts and other agreements entered into by the Parties, Plaintiffs agreed to work, exclusively, for Defendants to prepare and submit EB-5 applications for the Projects and to seek investment financing for the Projects. In return, Defendants agreed to pay Plaintiffs and to present timely and accurate information regarding the Projects which information was to be used in support of the EB-5 applications (to be made under penalty of perjury) and in support of efforts to obtain investment financing for the Projects.

### 138.

Defendants breached the Breached Contracts by, inter alia, failing to provide timely and accurate information needed for Plaintiffs to proceed with EB-5 applications for them and to seek funding for them. Instead, Defendants caused

Plaintiffs unnecessary harm and expense by providing false and misleading information about the Projects.

### 139.

Defendants' breaches continued despite repeated warnings by Plaintiffs that timely and accurate information was crucial for the success of the Projects.

### 140.

Defendants' breach of the Breached Contracts has proximately caused harm to Plaintiffs, including but not limited to Plaintiffs' loss of fees, profits, and other payments that Plaintiffs should, and would, have received over the life of the contemplated Projects. Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## COUNT IX
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

### 141.

Plaintiffs hereby incorporate by reference Paragraphs 1-100 of this Complaint.

### 142.

As alleged above in the prior Count VIII of this Complaint, Plaintiffs and Defendants entered into contracts including the Breached Contracts.

143.

The parties' contracts each included an implied covenant of good faith and fair dealing with regard to the negotiation and performance of those contracts. As such, Defendants had an implied duty to act in good faith and to engage in fair dealing under the contracts with Plaintiffs.

144.

The parties' implied covenants of good faith and fair dealing included a duty to negotiate in good faith with each other and prohibited acts in bad faith, such as any effort by Defendants make representations aimed at lulling Plaintiffs into moving forward with Plaintiffs' exclusive work on the Projects, when Defendants were in fact intending soon to unilaterally terminate Defendants' relationship with Plaintiffs. Such bad faith is actionable.

145.

Out of an abundance of caution, and in the event that Defendants argue that the Term Sheet (Exhibit "F" hereto) is not a binding contract, Plaintiffs allege in the alternative that Defendants acted in bad faith by continuing to negotiate with and work with Plaintiffs, when Defendants knew that they would soon be suddenly and unilaterally ending the parties' relationship.

146.

Defendants' breaches of their duty to comply with the implied covenant of good faith and fair dealing have proximately harmed Plaintiffs in an amount to be determined at trial. Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## COUNT X
**(Unjust Enrichment/Quantum Meruit)**

147.

Plaintiffs hereby incorporate by reference Paragraphs 1-100 of this Complaint.

148.

Plaintiffs assert this Count X in the alternative to their claim for breach of contract made above in Count VIII.

149.

Plaintiffs provided services to and for Defendants that were valuable and that were valuable to Defendants, including but not limited to assistance with EB-5 and other financing for the Projects.

150.

Defendants requested that Plaintiffs provide these valuable services.

151.

Defendants knowingly accepted these valuable services from Plaintiffs and knowingly allowed Plaintiffs to perform these valuable services for and on behalf of Defendants.

152.

Defendants' receipt of these valuable services from Plaintiffs, without compensating Plaintiffs for such services, would be, and is, unjust.

153.

Plaintiffs expected compensation for these valuable services, at the time that Plaintiffs performed them.

154.

Plaintiffs are therefore entitled to recover from Defendants the value of these valuable services in an amount to be determined at trial. Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## COUNT XI
## (Exemplary Damages)

155.

Plaintiffs hereby incorporate by reference Paragraphs 1-112 of this Complaint.

156.

Based on Defendants' actions and intent with respect to Plaintiffs and the allegations stated above, Plaintiffs are entitled to recover exemplary damages from Defendants in the form of both punitive damages, pursuant to O.C.G.A. § 51-12-5.1, and treble damages pursuant to Plaintiff's federal and Georgia RICO claims stated above.

157.

Defendants' actions with respect to Plaintiffs have shown willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences.

## COUNT XII
## (Attorney's Fees)

158.

Plaintiffs hereby incorporate by reference Paragraphs 1-157 of this Complaint.

159.

Defendants have acted in bad faith, been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

160.

Plaintiffs are entitled to recover from Defendants all reasonable attorney's fees incurred by Plaintiffs in regard to this dispute, pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiffs pray:

a. That the Court enter judgment in Plaintiff's favor and against Defendants in an amount to be proven at trial for compensatory and exemplary damages, including but not limited to, punitive damages and treble damages;

b. That Plaintiffs recover their expenses, including attorney's fees, from Defendants;

c. That all cost of this action be taxed against Defendants; and

d. That the Court award such other and further legal and equitable relief as is just and proper; and

e. That all issues be tried before a jury.

Respectfully submitted this 30th day of September, 2016.

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**

1180 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30309
Telephone: 404.348.8585
Facsimile: 404.467.8845
thomas.grant@lewisbrisbois.com

THOMAS C. GRANT
Georgia Bar No. 297455

*Counsel for Plaintiffs*

# EXHIBIT "A"

# Filed Under Seal

# EXHIBIT "B"

# Filed Under Seal

# EXHIBIT "C"

# Filed Under Seal

# EXHIBIT "D"

# Filed Under Seal

# EXHIBIT "E"

# Filed Under Seal

# EXHIBIT "F"

# Filed Under Seal

# EXHIBIT "G"

# Filed Under Seal

# EXHIBIT "H"

# Filed Under Seal

# EXHIBIT "I"

# Filed Under Seal

# EXHIBIT "J"

# Filed Under Seal

# EXHIBIT "K"

# Filed Under Seal

# EXHIBIT "L"

# Filed Under Seal

# EXHIBIT "M"

# Filed Under Seal

# EXHIBIT "N"

# Filed Under Seal

# EXHIBIT "O"

# Filed Under Seal

# EXHIBIT "P"

# Filed Under Seal

# EXHIBIT "Q"

# Filed Under Seal

# EXHIBIT "R"

# Filed Under Seal

# EXHIBIT "S"

# Filed Under Seal

# EXHIBIT "T"

# Filed Under Seal

# EXHIBIT "U"

# Filed Under Seal