UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FIVE ON FIFTY, LLC; GATE INDUSTRIES, LLC; and SOUTHERN FILM REGIONAL CENTER-ATLANTA, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> F. RAYMON BEAN; DAVID SHAFFER; JEFFREY KUEHR; GREENFUELS ENERGY, LLC; GEORGIA RENEWABLE POWER, LLC; GRP FRANKLIN, LLC; GRP MADISON, LLC; GRP NORTH CAROLINA, LLC; NORTH CAROLINA RENEWABLE POWER-LUMBERTON, LLC; and NORTH CAROLINA RENEWABLE POWER-ELIZABETHTOWN, LLC, <br><br> Defendants. | CIVIL ACTION <br> NO. 1:16-CV-3690 <br><br> **JURY DEMAND** |

## FIRST AMENDED COMPLAINT

Plaintiffs Five on Fifty, LLC; Gate Industries, LLC; and Southern Film Regional Center-Atlanta, LLC (collectively, "Plaintiffs") hereby file this First Amended Complaint against Defendants F. Raymon Bean; David Shaffer; Jeffrey Kuehr; GreenFuels Energy, LLC; Georgia Renewable Power, LLC; GRP Franklin, LLC; GRP Madison, LLC; GRP North Carolina, LLC; North Carolina Renewable

Power-Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC (collectively, "Defendants") and state as follows:

## I.  **INTRODUCTION.**

### 1.

Defendants are individuals and entities that hold themselves out as having significant experience and expertise in the electrical power generation industry.[1] Before being introduced to Plaintiffs, Defendants had been pursuing a complex, multi-million  dollar business venture that involved acquiring and building four electrical power plants—two located in northern Georgia and two in southern North Carolina—that would  generate revenue by selling electrical power to utilities pursuant to power purchase agreements with those utilities.  The plants were to be modernized to employ technologies that would produce renewable energy from bio fuels, such as wood and chicken waste (also referred to as chicken litter).

### 2.

Because the Entity Defendants could not fund the entire venture themselves, they needed significant investment of more than $200,000,000.00 and were therefore seeking funding from other sources, when they met Plaintiffs, who have experience

---

[1] Defendants F. Raymon Bean; David Shaffer; Jeffrey Kuehr are referred to collectively as the "Individual Defendants."  The remaining seven Defendants are entities and are referred to collectively as the "Entity Defendants."

and expertise with obtaining funding for EB-5 Projects.  (EB-5 Projects are part of the "EB-5" foreign investment program that is overseen by the United States Citizenship and Immigration Services ("USCIS").)   EB-5 Projects involve a complex, lengthy, and expensive application process that can take a year or more, whereby an applicant must demonstrate to the USCIS that the underlying business venture for a project will create at least a specified number of jobs in order to attract foreign investment which is demonstrated, *inter alia*, through submission of a detailed business plan supported by an economist's report.

3.

The Entity Defendants retained Plaintiffs to apply for, and fund, an EB-5 project for each of the four power plants (collectively, the "Projects").  The Individual Defendants communicated with Plaintiffs about the Projects on behalf of the Entity Defendants.   Dominic ("Nic") Applegate and Lowell Elliott communicated with Defendants on behalf of the entities that are named as Plaintiffs in this action. Because of the large scope of the Projects and the substantial work that would be required for the Projects, Defendants Shaffer and Bean asked Plaintiffs to focus on Defendants' four Projects and to work on them exclusively for an entire year, which Defendants agreed to do, and did, turning down other Projects throughout that period of time.  Plaintiffs were to receive payment for expenses and services necessary to

prepare valid applications for each project and then stood to earn significant compensation, in excess of $25 million over a period of years, for their work in raising EB-5 funding the Projects through foreign investment.

4.

Because EB-5 project applications involve serious and complex representations to the USCIS, made under penalty of perjury, Plaintiffs stressed from the outset of their relationship with the Entity Defendants that the EB-5 applications must be completely accurate in describing the details of the Projects, to demonstrate to the USCIS that each project would in fact produce enough power and jobs to meet requirements and would be able to support at least $166,000,000.00 in foreign investment in the domestic Projects, as required for USCIS approval.

5.

In hindsight, Plaintiffs now know that the Individual Defendants, individually and on behalf of the Entity Defendants, fraudulently induced Plaintiffs into working with the Entity Defendants to apply for and seek funding for the Projects by representing that the Entity Defendants had the knowledge, assets, permits, and equipment necessary to meet the EB-5 requirements for job-creation and investment. Relying upon Defendants' representations about the cost, operation, output, and revenues associated with each of the Projects, Plaintiffs agreed to set aside

all new business and to work exclusively on Defendants' four EB-5 Projects for a year, beginning in November 2014.

6.

As work on the Projects continued over a period of months, however, Plaintiffs began to discover that Defendants had fraudulently misrepresented (and omitted) key facts about the Projects that were to be used in the EB-5 applications for the Projects, to prove that each project was financially viable and would produce revenues necessary to fund the underlying business. These misrepresentation and omissions occurred through interstate emails, telephone calls, and in face-to-face meetings.

7.

For instance, Defendants misrepresented the type and size of a boiler that was a key part of the Lumberton plant's ability to generate the requisite amount of electrical power to meet the requirements of a Power Purchase Agreement with Duke Energy, at a certain cost, and in doing so greatly exaggerated the amount of power that would in fact be generated. This and other key factors regarding the performance and profitability of the Projects were the basis for very detailed representations about each of the Projects that were contained in large, complex "pro forma" spreadsheets that the Individual Defendants (acting on behalf of the Entity Defendants) periodically sent to,

and discussed with, Plaintiff Gate Industries.  The Defendants represented to Plaintiff Gate Industries that the pro formas they produced were current and accurate.

8.

As another example, the Individual Defendants withheld from Plaintiffs that two key personnel who were overseeing the Projects had quit because of their dissatisfaction with Defendants' handling of the Projects.

9.

Even after being warned by Nic Applegate and other representatives of Plaintiffs about these misrepresentations, the Entity Defendants proceeded in bad faith and chose not to pay for updated economic studies and reports that would be necessary to revise the EB-5 applications to reflect the true facts and figures about the Projects.

10.

Another example of Defendants' misrepresentations about the viability of the power Projects is the fact that the operation of the Lumberton plant had to cease for months, because Defendants were unable to outfit and operate it within the applicable legal limits for pollution.  Furthermore, even when that plant has been operational, it has consistently failed to generate the amount of electricity that Defendants

represented that it would, making it clear that the Lumberton plant could perform as represented by Defendants in their EB-5 application.

11.

Rather than continuing to work in good faith with Plaintiffs on the Projects, the Entity Defendants instead purported to continue working with Plaintiffs to fund the Projects, when the Entity Defendants were instead actively soliciting yet another source of funding for the Projects, which the Entity Defendants ultimately pursued after Defendant Shaffer suddenly and unilaterally terminated their commercial relationship with Plaintiffs.  The Entity Defendants ultimately breached their contracts with Plaintiffs and ended Plaintiffs' involvement in the Projects, which deprived Plaintiffs of the money that Plaintiffs would have earned from the Projects.  Having sought investment in their power Projects from other sources, both before and after they used Plaintiffs for EB-5 financing, Defendants' fraudulent activities constitute an interstate enterprise that (i) has committed wire and mail fraud and thus violates Federal and state RICO laws, (ii) has committed fraud, (iii) has breached contracts, and (iv) failed to act in good faith.  Therefore, Plaintiffs have filed this action seeking relief for the damage done to them, including lost fees, profits, and other amounts that Plaintiffs will not receive, as a proximate cause of Defendants' fraud, bad faith, and other improper acts.  Defendants' actions have also harmed Plaintiffs by causing

Plaintiffs to spend additional time and effort working on the Projects, which caused Plaintiffs both to spend additional resources on the Projects and also reduced Plaintiffs' ability to work on (and be paid for) other matters.

## II.   PARTIES, VENUE, AND JURISDICTION.

12.

Plaintiff Five on Fifty, LLC ("Five on Fifty") is a limited liability company registered in Delaware that is a citizen of Georgia.  Its role in the Projects included service as the "NCE manager" for each fund involved in each Project.  Five on Fifty would receive compensation for services that it provided in relation to each of the Projects.

13.

Plaintiff Gate Industries, LLC ("Gate Industries") is a limited liability company registered in Delaware that is a citizen of Georgia.  Gate Industries played a key role in nearly all aspects of the Projects, from their beginning—developing EB-5 plans for submission to the USCIS, working to ensure government approval of those plans, and seeking investment in the related Projects.

14.

Plaintiff Southern Film Regional Center-Atlanta, LLC ("SFRC") is a limited liability company registered in Georgia.  SFRC was the EB-5 regional center that was

associated with the Projects.  (EB-5 projects must be associated with a regional center approved by the USCIS.)

15.

Defendant F. Raymon Bean ("Bean") is a natural person who, upon information and belief, is a citizen of Alabama.  Bean has acted as a representative and agent of the Entity Defendants with respect to the Projects and other matters described in this Complaint.  Defendant Bean directly or indirectly owns all of the Entity Defendants.

16.

Defendant David Shaffer ("Shaffer") is a natural person who, upon information and belief, is a citizen of Pennsylvania.  Shaffer has acted as a representative and agent of the Entity Defendants with respect to the Projects and other matters described in this Complaint.

17.

Defendant Jeff Kuehr ("Kuehr") is a natural person who, upon information and belief, is a citizen of Indiana.  Kuehr has acted as a representative and agent of the Entity Defendants with respect to the Projects and other matters described in this Complaint.

18.

Defendant GreenFuels Energy, LLC ("GreenFuels") is a limited liability company registered in Delaware that is a citizen of Alabama. Defendant Bean owns all of Defendant GreenFuels. The Individual Defendants have acted and communicated on behalf of GreenFuels, including the actions and communications that have a nexus with Georgia, as explained below. Defendant GreenFuels is also a party to the four Engagement Agreements, each of which expressly subjects GreenFuels to the jurisdiction of this Court and to the application of Georgia law. Defendant GreenFuels also owns and/or operates two power plants located in Georgia.

19.

Defendant Georgia Renewable Power, LLC ("Georgia Renewable Power") is a limited liability company registered in Delaware that is a citizen of Alabama. Defendant GreenFuels owns all of Defendant Georgia Renewable Power. The Individual Defendants have acted and communicated on behalf of Georgia Renewable Power, including the actions and communications that have a nexus with Georgia, as explained below. Defendant Georgia Renewable Power is also a party to the four Engagement Agreements (as an affiliate of GreenFuels), each of which expressly subjects Georgia Renewable Power to the jurisdiction of this Court and to the

-10-

application of Georgia law.  Defendant Georgia Renewable Power also owns and/or operates two power plants located in Georgia.

20.

This Court has personal jurisdiction over the parties to this action for reasons that include, *inter alia,* their work performed in the Northern District of Georgia on large power plant projects, which work involved the Individual Defendants' presence in Georgia (on behalf of the Entity Defendants) to visit the Georgia power plants, to meet with Plaintiffs' representatives, and to meet with professionals in Atlanta regarding the complex transactions and documents associated with the Projects. Among other things, the Individual Defendants (acting in part as representatives of the Entity Defendants), frequently attended meetings in  Atlanta as they worked with counsel at the Atlanta office of the Seyfarth Shaw law firm, which served as the Entity Defendants' counsel for the Projects.  Although the two North Carolina power plants are not located in Georgia, the North Carolina entities associated with those projects had representatives (including the Individual Defendants) who frequently communicated and met with professionals in Atlanta, in relation to the financing of the Projects.

21.

Defendant Bean is the managing member of Defendant Georgia Renewable Power, which operates and/or owns power plants located in Georgia.  Defendant Bean's contacts with Georgia (individually and as a representative of the Entity Defendants, all of which he directly or indirectly owns) include the following:

   a.   Defendant Bean met Nic Applegate (as a representative of Plaintiffs) at the offices of SFRC in Atlanta, to discuss the terms and other aspects of the Projects;

   b.   On numerous occasions during the nearly two years that the parties worked on the Projects, Defendant Bean frequently attended meetings with lawyers and other professionals at the Atlanta office of Seyfarth Shaw regarding the Projects;

   c.   Defendant Bean visited the plant in Franklin, Georgia, to meet with Mr. Applegate and others concerning the Projects;

   d.   Defendant Bean made numerous visits to the power plants in Franklin and Madison, Georgia;

   e.   Upon information and belief, Defendant Bean made numerous, multi-day trips to and throughout Georgia in an effort to negotiate contracts for the

supply of wood and other biofuels to be used at the Franklin and Madison plants;

f.     Defendant Bean negotiated and executed a Power Purchase Agreement between Georgia Power and Defendant GRP Franklin, LLC (dated June 15, 2015) for the Franklin plant, which agreement is governed by Georgia law and contains an arbitration provision that requires any disputes regarding the agreement to be arbitrated in Atlanta;

g.     Defendant Bean negotiated and executed a Power Purchase Agreement between Georgia Power and Defendant GRP Madison, LLC (dated November 23, 2015) for the Madison plant, which agreement is governed by Georgia law and contains an arbitration provision that requires any disputes regarding the agreement to be arbitrated in Atlanta;

h.     Defendant Bean communicated frequently by telephone and email with people in Atlanta regarding the Projects (primarily with professionals and others at the Atlanta office of Seyfarth Shaw); and

i.     Defendant Bean owns (directly and indirectly) entities that operate two power plants in Georgia and has caused promotional and other literature to be distributed to potential investors that specifically identifies him as a key part of the team that will operate those plants.

22.

Defendant Shaffer is the president and Chief Operating Officer of Defendant Georgia Renewable Power, which operates and/or owns power plants located in Georgia.   Defendant Shaffer's contacts with Georgia (individually and as a representative of the Entity Defendants) include the following:

a.   Defendant Shaffer met Nic Applegate (as a representative of Plaintiffs) at the offices of SFRC in Atlanta, to discuss the terms and other aspects of the Projects;

b.   On numerous occasions during the nearly two years that the parties worked on the Projects, Defendant Shaffer frequently attended meetings with lawyers and other professionals at the Atlanta office of Seyfarth Shaw regarding the Projects;

c.   While the Projects were ongoing, Defendant Shaffer asked Mr. Applegate (as a representative of Plaintiffs) to meet Mr. Shaffer at the Atlanta airport to discuss the Projects, which meeting occurred as requested;

d.   Defendant Shaffer visited the plant in Franklin, Georgia, to meet with Mr. Applegate and others concerning the Projects;

e.    Defendant Shaffer made numerous visits to the power plants in Franklin and Madison, Georgia; including many meetings there with Terry Williams, who previously worked as vice president of construction on the Projects;

f.    Defendant Shaffer visited Georgia to personally attend meetings with local government officials and residents, to promote the Projects, including a trip to Jefferson County, Georgia, which was originally to be the location for what ultimately became the Franklin plant;

g.    Defendant Shaffer was intimately involved in the construction and operation of the Franklin and Madison plants; consequently, the "Notice" provisions in both Power Purchase Agreements for those plants list him as the sole contact to receive notices concerning those two agreements;

h.    Defendant Shaffer communicated frequently by telephone and email with people in Atlanta regarding the Projects (primarily with professionals and others at the Atlanta office of Seyfarth Shaw); and

i.    Defendant Shaffer supervises and/or controls the operation of two power plants in Georgia and has caused promotional and other literature to be

-15-

distributed to potential investors that specifically identifies him as a key part of the team that will operate those plants.

23.

Defendant Kuehr is the Finance Director of Defendant Georgia Renewable Power, which operates and/or owns power plants located in Georgia.  Defendant Kuehr's contacts with Georgia (individually and as a representative of the Entity Defendants) include the following:

a.  Defendant Kuehr met with Mr. Applegate (as a representative of Plaintiffs) in Atlanta on several occasions to discuss the Projects;

b.  On numerous occasions during the nearly two years that the parties worked on the Projects, Defendant Kuehr frequently attended meetings with lawyers and other professionals at the Atlanta office of Seyfarth Shaw regarding the Projects;

c.  Upon information and belief, Defendant Kuehr has also traveled to Georgia to see the Madison and Franklin plants;

d.  Defendant Kuehr communicated frequently by telephone and email with people in Atlanta regarding the Projects (primarily with professionals and others at the Atlanta office of Seyfarth Shaw); and

e.      Defendant Kuehr supervises and/or controls the operation of two power plants in Georgia and has caused promotional and other literature to be distributed to potential investors that specifically identifies him as a key part of the team that will operate those plants.

24.

Defendant GRP Franklin, LLC and Defendant GRP Madison, LLC each own and/or operate a power plant located in Georgia.  These Defendants have also been registered to do business in Georgia since at least February 17, 2015.  In addition, Defendant GRP Franklin, LLC and Defendant Madison, LLC are part of a larger venture involving the Entity Defendants that worked to fund the Projects.  (*See, e.g.* Exhibit "E" to the Complaint, [2] in which Defendant Shaffer acknowledged that "GreenFuels…***and Affiliates***" were parties to Defendants' relationship with Plaintiff Gate Industries regarding the "financing, construction and operation of GreenFuels' biomass facilities and projects, which include each of the Projects").  Also, Defendant GRP Franklin, LLC and Defendant GRP Madison, LLC are each parties to a Power Purchase Agreement with Georgia Power Company regarding the generation of power in Georgia to supply power to Georgia utilities.

---

[2] Unless otherwise indicated the exhibits referenced in this Amended Complaint are the exhibits that Plaintiff filed in support of their initial Complaint in this action.

25.

Defendant GRP North Carolina, LLC; North Carolina Renewable Power-Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC (collectively, the "North Carolina Defendants") are each subsidiaries of Defendant GreenFuels and are each affiliates of GreenFuels.  (*See, e.g.* Exhibit "E" to the Complaint, in which Defendant Shaffer recognizes that the venture to finance the Projects included GreenFuels and its "Affiliates.")  Furthermore, as parties to the venture to fund and operate the Projects, the Individual Defendants (acting on behalf of the North Carolina Defendants) performed many actions and communications, in and around Atlanta, to prepare and submit EB-5 applications, including communications with, and presence at, the offices of Seyfarth Shaw in Atlanta and meetings in and around Atlanta with representatives of Plaintiffs.

26.

This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367.  The current in controversy in this action exceeds $75,000.00, exclusive of interest and costs.

27.

Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) because, *inter alia*, a substantial part of the events or omissions giving

-18-

rise to this dispute occurred in Georgia, and because a substantial part of the property that is the subject of this action is situated in the Northern District of Georgia.

28.

Venue is also proper as to Defendants, pursuant to 18 U.S.C. § 1965, based on their work on power plant projects in the Northern District of Georgia, including work to approve and fund those projects that required them to engage in frequent communications with, and meetings at, the offices of Seyfarth Shaw in Atlanta.

29.

Additionally, Defendant GreenFuels (individually and through its "affiliates") is a party to four separate "Engagement Agreements" (one for each EB-5 power plant project), each of which contains a venue and choice of law provision that applies Georgia law, and requires that "[a] suit, action or proceeding arising out of or relating to [the] Agreement may be maintained in any court of competent jurisdiction in Fulton County, Georgia, and each party waives all objections to such jurisdiction and venue." (True and correct copies of these four Engagement Agreements are attached as Exhibits "A"-"D" (collectively, the "Engagement Agreements").)   (*See also* Exhibit "C," in which Defendant Shaffer recognizes that the contractual relationship regarding the Projects included both Defendant GreenFuels and its "affiliates.")

### III.   BACKGROUND FACTS.

#### A.   Defendants Are Affiliated Persons and Entities Who Were Collectively Seeking to Fund a Business Venture That Involved the Production of Electrical Power Using Biomass Materials at Four Power Plants Located in Georgia and North Carolina.

30.

Before the Individual Defendants were introduced to Plaintiffs, they had caused the Entity Defendants to form a venture involving the production of electrical power at four power plants, located in (i) the City of Madison, Georgia, (ii) the Village of Franklin, Heard County, Georgia, (iii) the City of Lumberton, North Carolina, and (iv) the Town of Elizabethtown, Bladen County, North Carolina.  (Defendants had initially explored operating a power plant in the City of Jefferson, Georgia, but opted instead to operate a power plant in the City of Madison.)

31.

As part of the venture, each of the power plants was to be modernized so that each could produce renewable energy to be generated from bio fuels, including wood pulp and chicken waste.

32.

Achieving profitable and sustainable levels of electricity from biofuels requires substantial expertise in a niche area of power production and the use of new and expensive technologies.  Among other things, biofuels create substantially more

moisture than traditional coal plants and thus do not produce energy as efficiently as do traditional, coal-burning power plants.  Also, the availability and price of biofuels is a key factor in a power plant's profitability, especially when two or more biofuel-burning plants are located near one another (which was the case in both Georgia and in North Carolina with respect to the Projects.)  This is because having two plants located near each other (as was the case in both Georgia and North Carolina) will increase demand on local supplies of fuel, thus increasing the price of fuel.  Therefore, being able to attract investors and funding for biofuel power projects requires a strong and verifiable business plan to demonstrate that a plant can and will produce the required amount of electrical power, at an overall cost that will allow the plant to operate at a specified profit level.

33.

Before the Entity Defendants were introduced to Plaintiffs, Defendants (acting through the Individual Defendants) had been seeking investment financing for their

venture from other sources.   In materials associated with that financing, the

relationship of the entities involved in Defendants' venture was listed as follows:[3]

---

[3] Plaintiff did not work directly with Power Fiber, LLC, with GRP Finance Corp. or GreenFuels International, LLC.   Plaintiffs are aware, however, that GreenFuels Energy, LLC and GreenFuels International, LLC are currently being sued for allegedly taking another party's business opportunity in violation of a non-circumvention agreement regarding a biofuel-powered project in Ireland.  *See MUN Associates, Inc., et al. v. GreenFuels Energy, LLC*, United States District Court for the District of New Jersey, Newark Division, Case No. 2:16-cv-04859-ES-JAD. In addition, Defendants Georgia Renewable Power and GreenFuels have been sued in this Court regarding their alleged nonpayment of $3,000,000.00 allegedly owed by them on a Purchase and Sale Agreement concerning the power plant in Franklin, Georgia, that was part of the Franklin Project.  *See SEA Green Energy Partners, LLC v. Georgia Renewable Power, LLC and GreenFuels Energy, LLC*, United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:16-cv-03617-CAP.   In other related, pending litigation, Defendants Georgia Renewable Power, LLC and North Carolina Renewable Power-Lumberton have been sued by "NRG," a provider of employees for operation of the Lumberton plant, for more that $637,000.00 owed for NRG's provision of employees at that plant.  *See NRG Energy Services, LLC et al. v. Georgia Renewable Power, LLC, et al.*, United States District Court for the Eastern District of North Carolina, Western Division, Case No. 7:16-CV-00390-BO.



34.

In an attempt to acquire financing for the four Projects that comprise Defendants' overall venture, Defendants (primarily through the Individual Defendants) engaged in interstate communications with Plaintiffs (primarily Gate Industries), beginning in approximately July 2014. These discussions involved obtaining financing for the Projects through foreign investment via the EB-5 Immigrant Investor Program overseen by the USCIS. (The Immigrant Investor program was created under the Immigration Act of 1990. The Regional Center Pilot Program was added as part of changes adopted in 1993.)

35.

Many of the parties' communications occurred via interstate email, mail, and telephone calls, given (i) that Defendants predominantly work out of Alabama, (ii) that Plaintiffs operated out of Georgia and South Carolina, and (iii) that the subject power plants are located in Georgia and in North Carolina.  In addition, the Individual Defendants (on behalf of the Entity Defendants) traveled to North Carolina and to Georgia to see the various power plants and to seek contracts for the large supply of biofuels that were needed to operate the Projects.  Furthermore, the Individual Defendants (on behalf of the Entity Defendants) often traveled to Georgia, often to Atlanta, to meet with lawyers at the Atlanta office of Seyfarth Shaw, which law firm performed the substantial amount of legal work required for the Projects, including work on the EB-5 plan documents.

36.

Defendants' continuing use of the entities and persons who pursued the Projects, as well as improper practices related to the funding of the Projects, is evidenced by facts including Defendant Shaffer's own letter, dated March 29, 2016, to Plaintiff Gate Industries that unilaterally ended Defendants' relationship with Plaintiffs.  Specifically, Defendant Shaffer sent that letter under the subject line, "GreenFuels Energy, LLC and Affiliates ('GreenFuels')," after which he stated,

"[t]hank you for your interest in working with GreenFuels and *its affiliates* in connection with the sourcing of debt and/or equity sources to facilitate the financing, construction and operation of GreenFuels' biomass facilities and projects." (These projects include the Projects at issue in this action.)  Defendant Shaffer also advised Gate Industries that "GreenFuels has recently entered into an exclusive arrangement" with another entity regarding "financing and financial structuring." Defendant Shaffer copied Defendant Bean and Defendant Kuehr on his letter. (A copy of that letter is Exhibit "E.")

### B.      Plaintiffs Provide Services Related to EB-5 Projects.

37.

Plaintiffs are related businesses that work together on EB-5 Projects—to assist in the preparation of the complex applications, and, upon approval by the USCIS, to assist clients in seeking foreign investment in these EB-5 Projects through foreign brokers and agents abroad.

38.

EB-5 Projects are part of the government sponsored EB-5 Program, which promotes job creation in the United States through foreign investment and allows certain qualified foreign investors to obtain green cards that allow them to live and work in the United States.

39.

The EB-5 process includes three major steps:  (i) application to the USCIS for approval of a project; (ii) solicitation of foreign investment to fund a project (which continues after USCIS approval); and (iii) approval of the application by the USCIS.

40.

In order for an EB-5 project to be approved by the USCIS, an applicant must file a lengthy and complex application which shows, *inter alia*, that the related project is a viable business opportunity that will create at least a specific number of jobs in a particular geographic area and thereby generate at least a certain level of foreign investment.

41.

Preparing an application for a single EB-5 project can take up to, or more than, a year and can cost well over $200,000.00.  Among other things, this is because EB-5 applications require the retention and use of a number of third-party professionals such as immigration and securities lawyers, economists, accountants, consultants, migration brokers and others.

42.

EB-5 applications must include an economist's report and a detailed business plan to demonstrate to the USCIS that the underlying business venture is viable and will create the required number of jobs and investment.

43.

Applicants seeking approval of an EB-5 project must certify that all information contained in an application is correct, under penalty of perjury.

44.

For example, the USCIS "Form I-924" that must be submitted with an EB-5 application includes the following "instructions":

> By signing this form, you have stated under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form is true and correct.  You also have authorized the release of any information from your records that USCIS may need to determine eligibility for the benefit you are seeking and consented to USCIS verification of such information.  Agency verification methods may include but are not limited to:  review of public records and information; contact via written correspondence, the Internet, facsimile, or other electronic transmission or telephone; unannounced physical site inspections of residences and places of employment; and interviews. Information obtained through verification will be used to assess your compliance with the laws and to determine your eligibility for the benefit sought.

45.

Similarly, the USCIS "Form I-924a" that must be submitted by a Regional

Center to verify the progress of an EB-5 Project includes the following language:

> I certify, under penalty of perjury under the laws of the United States of America, that this form and the evidence submitted with it are all true and correct.  I authorize the release of any information from my records that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit being sought.  I also certify that I have authority to act on behalf of the Regional Center.

46.

The accuracy of information submitted in an application to the USCIS is

especially important, because recent high profile episodes of fraud related to EB-5

Projects have resulted in large sanctions and have heightened USCIS attention to the

representations made in EB-5 applications.

47.

Once an EB-5 application is submitted, a project can proceed, including

solicitation of foreign investment to fund the approved project.  Only submission of a

Project Application is needed to market the Project and take investor funds into

escrow.  USCIS approval is not necessary to begin marketing a Project.

**C.** **The Entity Defendants Engaged Plaintiffs to Apply for and Fund an EB-5 Project for Each of the Four Power Plants in Georgia and North Carolina.**

48.

On or about July 1, 2014, Defendant GreenFuels and its affiliates engaged Plaintiff Gate Industries and Plaintiff SFRC to apply for and, upon submission of application, to fund an EB-5 project for each of the four power plants in Georgia and North Carolina that were part of the Entity Defendants' overall venture to make money through the generation and sale of electricity to utility companies, using biomass materials.

49.

Due to the great size and complexity of each of the Projects, which involved details and logistics concerning the modernization and operation of each power plant, and the amount of investment being sought, Plaintiffs Gate Industries and SFRC explained to Defendants the substantial amount of time, effort, and expense that would be involved in preparing the EB-5 applications and, thereafter, seeking funding of the Projects.

50.

In response, Defendant Shaffer (acting on behalf of the Entity Defendants) repeatedly asked Plaintiffs (in the presence of others) to work exclusively and only on

the applications for the four power plant Projects for one year.  Defendant Bean was aware of this request for exclusivity with respect to the Entity Defendants, which he owns, either directly or indirectly.  Plaintiffs agreed and honored that request by working exclusively on the Projects for a year, foregoing other business opportunities as a result.

51.

On July 1, 2014, GreenFuels and its affiliates[4] entered into four nearly identical "Engagement Agreements" with Gate Industries and SFRC–ATL for each of the four Projects.  Defendant Shaffer signed three of the four Engagement Agreements, copies of which are attached as Exhibits "A"-"D."  The Engagement Agreement for the Lumberton Plant was signed by Chris Colucci, who was then working for certain of the Defendants on the Projects.  (Mr. Colucci subsequently quit and ceased work on the Projects.)

---

[4]  As previously described above, the involvement and participation of "affiliates" of GreenFuels is evident, *inter alia*, from Defendant Shaffer's termination letter (*see* Exhibit "E"), which recognizes the involvement of such "affiliates" "in connection with the sourcing of debt and/or equity sources to facilitate the financing, construction and operation of GreenFuels' biomass facilities and projects," which in turn was the object of the Engagement Agreements.

52.

Each of the Engagement Agreements included as attachments both (i) a "Critical Path and Timeline" that outlined the phases required to prepare a final application to the USCIS, and (ii) a chart summarizing the significant "Estimated Expenses" that would be required for the application process.

53.

The "Critical Path and Timeline" described the five "Phases" of the EB-5 application process, ending with "Phase V" which concluded with submission of an application for each of the Projects to the USCIS for consideration and approval.

54.

Sections 9 and 10 of the Engagement Agreements specified the types of information that the Entity Defendants would need to provide for the Projects and the information that would be provided to the USCIS in regard to them.  In addition, Plaintiffs made clear to all Defendants through numerous written and oral communications that other information about the Projects must be accurately reported to the USCIS.

55.

Because of the importance of providing accurate and complete information to the USCIS in regard to the Projects (under penalty of perjury), the Entity Defendants agreed as follows in the Engagement Agreements:

> REPRESENTATIONS BY THE CLIENT.  The acts, statements and representations made by or on behalf of the Client to prospective foreign investors or other transaction counterparties about the Client or the Project, including but not limited to representations in the Business Plan, Private Placement Memorandum or other offering documents, ***are the sole responsibility of the Client and the Client agrees to indemnify the Regional Center*** and its officers, directors, members, managers, employees, attorney, and agents ***for any liability, claims, losses and expensed, including legal expenses, incurred by the Regional Center that result from any of the Client's acts, statements and representations about the Client or the Project.***

(Engagement Agreements (Exhibits "A"-"D"), § 15 (emphasis added).)

56.

As the parties continued to work together to apply for and fund the Projects, Plaintiffs and the Entity Defendants memorialized the steps and terms for funding the Projects, by executing a detailed "Term Sheet," dated April 6, 2015, a copy of which is Exhibit "F."  The Term Sheet incorporated as part of its terms an attached "Project Checklist for Team of Professionals" (the "Term Sheet Checklist").

57.

The parties to the Term Sheet included Plaintiff Gate Industries "or an affiliate or subsidiary thereof," all of which are collectively defined as the "New Commercial Enterprise or NCE" party to the Term Sheet.  Section II, on page 5 of the Term Sheet, identified Plaintiff Five on Fifty, LLC in relation to Gate Industries' work as the "NCE."

58.

As stated on the first page of the Term Sheet, the Term Sheet concerned the funding of the Projects, and collectively identified four limited liability companies as the "Lender," each of which was named after the city in which the Project was located.  Although the four entities listed on that page in the Term Sheet include the name "fund" in them (none of which were created, according to the Georgia Secretary of State), the parties' intent was to use the following entities (created in Georgia, in early 2015):  GRP Franklin, LLC; GRP Madison, LLC; North Carolina Renewable Power-Lumberton, LLC; and North Carolina Renewable Power-Elizabethtown, LLC (all of which are included as defendants in this action.)  (Although the Term Sheet lists these four entities having the word "Trust" in their names, the parties used the entities referenced in the preceding sentence.)

59.

The continuity of the Term Sheet in regard to the parties' ongoing work being performed to apply for and then fund the Projects is evident from the detailed Term Sheet Checklist, which like the Engagement Agreements, contained a detailed explanation of the numerous "Phases" involved in the EB-5 process for each of the Projects.

60.

Before the parties' relationship would end due to the Entity Defendants' abrupt termination of their relationship with Plaintiffs, the parties had completed the first three of the four Phases listed in the detailed Term Sheet Checklist, and Plaintiffs had already taken significant steps toward, and invested considerable time and effort in, completing the final, fourth Phase which concerned the funding of the Projects.

61.

Plaintiffs were especially interested in funding the Projects because it was the funding phase of each Project through which Plaintiffs would receive substantial payments, including a percentage of all investment and related fees for work regarding the financing.  This future stream of payments was one of the main reasons that Plaintiffs agreed to work exclusively on the Projects for a year.

**D.    After Working Diligently and Exclusively for Months to Apply for And Fund the Projects, Plaintiffs Began to Encounter Problems Receiving Accurate and Prompt Information About Key Aspects of The Projects That Was Vital to Approval and Funding of the Projects.**

62.

Because each of the four power plants involved in the four Projects was the sole source of profits and job-creation necessary for obtaining EB-5 approval and, subsequently, the necessary level of foreign investment, the details about the operation and performance of each power plant were critical.

63.

Each of the four power plants would produce revenue by supplying electrical power to the applicable local power utility (here, Georgia Power for the Georgia power plants, and Duke Energy for the North Carolina power plants).  The terms of each plant's supply of power to each utility was governed by a separate power purchase agreement (commonly referred to as a "PPA").  Accordingly, the PPA for each plant dictated, among other things:  (i) the amount of electrical power that a plant had to supply to the utility; (ii) the deadline by which the power plant had to be able to produce that amount of power; and (iii) the price to be paid by the contracting utility for that amount of power.

64.

The PPA for each plant also contained a significant liquidated damages provision that required the entity operating a power plant to pay liquidated damages, if a plant was not fully operational by the contracted deadline.

65.

Therefore, the viability and success of each of the Projects depended entirely on the Entity Defendants' ability to bring each plant online and to produce the required level of electrical power by the required deadline, and at a profitable cost.

66.

Among other things, assumptions about these facts were a key part of the EB-5 application for each of the Projects, as well as to attracting the required level of investment that would be necessary to fund the Projects.

67.

Because of the size and complexity of the four power plants at issue, Plaintiffs were largely dependent upon the expertise and communications of the Entity Defendants, and their contractors and consultants, for knowing that the representations in the EB-5 applications for each of the Projects were accurate and realistic.  One of the key documents through which the Entity Defendants communicated the detailed assumptions about each of the Projects was a "pro forma"—a very detailed group of

spreadsheets that the Entity Defendants periodically prepared and communicated to Plaintiffs, via interstate emails.  Through the pro formas, the Entity Defendants made detailed representations to Plaintiffs and to the professionals working on the Projects about the performance, equipment, cost, and profit of each plant and Project.

68.

For example, one key element of, and assumption for, each of the Projects was the type of equipment to be used at each power plant.  This was especially important for the Projects, because they all involved reconfiguring older, coal-burning plants to produce power from biofuels using modern, high tech equipment.  The equipment, permits and other important aspects of the Projects were communicated, *inter alia*, through factors such as output, parasitic load, availability, and heat rate—all of which could be determined from the pro formas prepared by the Entity Defendants.

69.

For example, a key part of the plan for the Lumberton Plant was to replace an antiquated boiler there with a modern, $70,000,000.00 Andritz Group boiler that was capable of generating the necessary amount of heat and hence power output using biofuels.  Consequently, using the new boiler was a key part of the plan for operating that project at a level that would be consistent with representations being made and the related EB-5 application, such that the Lumberton project would meet the job-creation

and investment requirements for that project. Based entirely upon information provided and confirmed by the Defendants, the numbers and other representations in the EB-5 application for the Lumberton plant assumed and represented that the plant would generate an output of 40mw (which turned out to be nearly double the amount of actual output).

70.

Although Defendants were aware that the EB-5 application documents for the Lumberton project continued to assume the use of such a new boiler, the Entity Defendants ultimately decided (on their own and without promptly informing Plaintiffs) against replacing the boiler, as initially planned. The Entity Defendants made that decision well before September 2015 but chose not to notify Plaintiffs until well into 2016.

71.

Consequently, as the September 2015 deadline approached to finalize the EB-5 application for the Lumberton (and other) Projects, Plaintiffs became concerned and requested (through interstate communications) that Defendants pay to have certain reports revised about the assumptions and expectations about the Lumberton Project, because inconsistencies and irregularities in the information provided in pro formas

and other communications suggested that the Lumberton power plant would not generate the output, profit, and job creation represented in the Lumberton plan.

72.

Plaintiffs therefore requested that Defendants pay to have the necessary reports revised, but Defendants, speaking through Defendant Schaffer, refused – even though certain members of Defendants' own team (including Defendant Kuehr) questioned how Defendants could proceed with the EB-5 application process, based on old and inaccurate data. Among other things, Defendant Schaffer stated that he did not want to pay an added expense for revisions to the reports used in the EB-5 application.

73.

As time passed while Plaintiffs continued to work exclusively on the Projects, Plaintiffs came to learn—belatedly (and after the submission of the EB-5 applications)—about other, serious problems with the Projects, including but not limited to the Lumberton Project.

74.

For example, even though Plaintiffs subsequently came to learn about a diligence report, dated August 10, 2015, that outlined numerous discrepancies and concerns about the representations about the Projects being made in the EB-5 applications, Plaintiffs did not become aware about that report, or many of the

problems discussed in it, until late February 2016, when Plaintiffs eventually received a copy of it.  Significantly, although Defendants had, and were aware of, that report at least one month before the EB-5 applications had to be finalized, Defendants did not attempt to inform Plaintiffs about the report or its contents, until many months later.  Similarly, it was not until late February 2016 that the Entity Defendants provided Plaintiffs with a "bank book" (dated 2015) which further demonstrated the inaccuracies that the Entity Defendants had allowed to remain in the EB-5 applications that they approved for submission.

75.

The significant effects of Defendants' misrepresentations and material omissions about the configuration, operation, and profitability of the Projects are evident from Defendants' inability to proceed with them.

76.

Upon information and belief, although the PPA for the Lumberton Power Plant called for the generation of at least 35 megawatts of power, that plant has been unable to generate more than approximately 20 megawatts, which level could only be sustained for a short period of time, due to problems with ash buildup caused by the burning of biofuels.

77.

Furthermore, and upon information and belief, it has not been possible to operate the Lumberton Plant, at all, for significant periods of time, because the plant has continually exceeded the permissible level of emissions, which has required shutdowns so that the plant could stay within the applicable pollution limits. (Although the Entity Defendants were aware of these permitting problems before submission of the EB-5 application for the Lumberton project, they did not inform Plaintiffs of this fact until months later.  Among other things, this caused Plaintiffs to seek investment in that Project based upon inaccurate representations about the plant's output.)

78.

In addition and upon information and belief, inability to operate the two Georgia plants at necessary levels of power production, has caused these plants to cease operating for periods of time.

79.

Although Defendants knew and/or should have known (for a considerable amount of time) about the problems that have significantly and adversely affected the operation of the power plants, they instead chose to misrepresent information about the plants to the Plaintiffs and to hide material facts from the Plaintiffs.  Consequently,

Plaintiffs were kept in the dark, as they continued to work, exclusively and for months, on the Projects.

80.

Another key misrepresentation and omission of Defendants with regard to Plaintiffs' work on the Projects concerns the continued involvement and employment of persons identified by Defendants as "key personnel" for the success of the Projects.

81.

The Entity Defendants' solicitations, disclosures, and other materials used to seek involvement and investment in the Projects have routinely stressed that the Projects were being overseen by key personnel with significant experience in the power production industry, in general, and with power generated from biofuels, in particular. These personnel have included Chris Colucci and Terry Williams (collectively the "Key Personnel").

82.

In or around the last quarter of 2015, as Plaintiffs grew concerned about the accuracy and completeness of information about the Projects, Nic Applegate, acting on behalf of Plaintiffs, began to ask the Individual Defendants about the continuing involvement of the Key Personnel on Projects. Mr. Applegate was curious because

the Key Personnel had not been appearing in ongoing communications about the Projects at that time, as they had before.

83.

When Mr. Applegate specifically asked Defendant Kuehr about the status of the Key Personnel with respect to the Projects, Defendant Kuehr falsely advised that they were still involved and knowingly failed to disclose to Plaintiffs that the Key Personnel had actually quit working for the Projects – more than a month before, as Plaintiffs would subsequently learn from another source.  Similarly, Defendants Shaffer and Bean also failed to respond accurately about the status of the Key Personnel, when asked by Nic Applegate in interstate phone calls that occurred after the departure of the Key Personnel.

84.

This concealment of material facts regarding the continued involvement of the Key Personnel is yet another fraudulent representation about the Projects, made through interstate commerce, on which Plaintiffs relied in deciding to continue their work, exclusively, on the Projects for Defendants.

85.

Upon information and belief, the Key Personnel voluntarily chose to quit and leave the Projects because of concerns about Defendants' ability to properly configure

and operate the Projects, and related concerns about maintaining their reputations in the electrical-power-generation industry, due to missteps by Defendants.

86.

As the parties reached the September 2015 deadline to finalize the EB-5 applications for the Projects, Plaintiffs became concerned about the accuracy and completeness of the information being provided by Defendants about the Projects. These concerns were heightened by the Entity Defendants' continued refusal to pay the relatively insignificant costs required to have economists and others update their reports so that the EB-5 applications were accurate and current for each of the Projects.

87.

Interstate emails between the parties demonstrate that even certain financial persons working on the Projects for Defendants had questioned how Defendants could proceed with the EB-5 applications, without revisions to reflect numerous changes, as had been directed by Defendant Schaffer.  However, the Entity Defendants ultimately chose not to pay for, or make, the related changes.  Among other things, Defendants communicated their decision not to revise the EB-5 application documents through interstate phone calls between Defendant Schaffer and Mr. Applegate, acting on behalf of Plaintiffs.

-44-

88.

Plaintiffs' concerns regarding the accuracy and completeness of Defendants' disclosures about the Projects increased further, in approximately January 2016, when Plaintiffs received an anonymous phone call expressing concerns about the accuracy of the information that Defendants had supplied.

89.

On January 31, 2016, Mr. Applegate, acting on behalf of Plaintiffs, sent a letter to Defendants, care of Defendant Bean, stating Plaintiffs' concerns about the accuracy of the information that Defendants had supplied and approved for inclusion in the EB-5 applications for the Projects.  (*See* Exhibit "G.")   Several weeks later, on February 18, 201, Jeff Kuehr attempted to address these concerns by sending Mr. Applegate (by interstate email) a "bank book" with additional financial and other information about the Projects.  In that email, Defendant Kuehr confirmed with Mr. Applegate that Defendant Kuehr and one of Defendants' attorneys would fly to Greenville, South Carolina, on February 23, 2016 to meet for "a 3 hour working session" to discuss the Projects.  That meeting occurred as scheduled.

90.

In February and March 2016, Mr. Applegate had numerous interstate telephone conversations with Defendant Bean about the Plaintiffs' concerns about the Projects.

Defendant Bean, in calls made to Mr. Applegate, assured Plaintiffs that Defendants had provided accurate information to Plaintiffs regarding the Projects and that Defendants would address any problems with that information. Defendant Bean's representations proved to be false and were part of a continuing pattern of fraud and misrepresentations about the Projects, aimed at having Plaintiffs continue their work on the Projects–at least until the Entity Defendants could find another source of funding for the Projects.

91.

Then, on March 29, 2016, Defendant Schaffer sent a letter to Plaintiff Gate Industries, via an interstate email, on behalf of "GreenFuels Energy, LLC and Affiliates" unilaterally terminating their relationship. Mr. Schaffer provided no explanation for this sudden move, other than to advise that Defendant GreenFuels, LLC and its affiliates had "recently entered into an exclusive arrangement with a strategic partner" to provide services "relating to financing and financial structuring." (*See* Exhibit "E.") This occurred just one month after Defendant Kuehr and Defendants' counsel had flown to Greenville to continue working with Plaintiffs on the Projects.

**E.**     **The Entity Defendants Have Also Encountered Problems Obtaining Financing from Other Sources Due to Their Continuing Failure to Provide Accurate, Verifiable Data About the Projects.**

92.

Since the breakdown of Plaintiffs' relationship with the Entity Defendants regarding the financing of the Projects, Plaintiffs have learned that the Entity Defendants have encountered similar problems seeking financing from other sources, due to Defendants' continuing inability to provide accurate information about the Projects.

93.

For instance, Defendants Bean, Shaffer, and Kuehr—acting on behalf of the Entity Defendants—were subsequently unable to obtain financing from an entity known as Constellation and (twice) from Capital Peak Asset Management ("Capital Peak").

94.

Upon information and belief, the Entity Defendants were unable to obtain financing for the Projects from Capital Peak, then unsuccessfully sought financing from Constellation, only to again fail in a second attempt with Capital Peak.

95.

Upon information and belief, Capital Peak grew frustrated about the Entity Defendants' inability to provide accurate, verifiable information about the performance and profitability of the power plants, including the Lumberton plant. For instance, whereas the Entity Defendants initially represented to Capital Peak that the Lumberton plant was capable of generating well over 30 megawatts of power and was then generating 25 megawatts, the Entity Defendants were unable to actually produce that amount of power. Instead, Defendants could only produce 20 megawatts at the Lumberton plant, and were only even able to reach that level for brief periods of less than a month at a time. (And yet, the Entity Defendants had repeatedly represented to Plaintiffs that the Lumberton plant could generate well over 30 megawatts on an ongoing basis.)

96.

Furthermore, and upon information and belief, third-party financing companies have expressed concerns about the ability of Defendant Kuehr (the Finance Director for Defendant Georgia Renewable Power) to solicit potential investors for the Projects, due to concerns about his past involvement in an alleged "fraudulent

scheme" as described by the Securities and Exchange Commission (the "SEC") for which he was sanctioned in the amount of $70,000.00.[5]

97.

Neither Defendant Kuehr nor the other Defendants shared this information with Plaintiffs.

F.    **The Pro Formas and Other Documents That Defendants Provided to Plaintiffs Repeatedly Misrepresented and Omitted Material Facts About the Projects That Were Crucial to the Approval and Successful Financing of the Projects.**

98.

As noted in this Complaint, Plaintiffs spent more than a year and a half working with Defendants to prepare accurate and successful EB-5 applications to obtain USCIS approval of, and foreign investment in, the Projects. Plaintiffs repeatedly stressed to the Individual Defendants the need for accuracy and consistency throughout the many, detailed documents to be submitted in support of the applications, including detailed economist reports and financials, which were vital to prove to the USCIS that the Projects would in fact create the jobs, profits, and

---

[5] *See* SEC Administrative Preceding, File No. 3-15946, *In the Matter of Jeffrey C. Kuehr and Michael J. Willoughby*, "Order Instituting Cease-and-Desist Proceedings" issued on or about June 25, 2014 (available online via the internet).

investment as represented in the applications (all of which the Defendant Entities approved before submission to the USCIS).

99.

One of the primary vehicles for the Defendant Entities' provision of this vital and detailed information about each plant and project were the pro formas that Defendants repeatedly created and provided to Plaintiffs, as well as to their legal counsel and other professionals who assisted on the Projects. The pro formas were very complex groups of spreadsheets that contained both macro-level, summary data about each plant's performance, job creation, electrical output, and profitability. They also contained highly detailed, technical representations and assumptions about all aspects of the plants, from their fuel supply and cost, ability to operate, equipment, construction, permitting, and operation. The Defendant Entities used the pro formas to communicate these details to Plaintiffs and other professionals with the knowledge that the pro formas would be relied upon by them to prepare applications and other documents for the Projects.

100.

Despite this knowledge, the Defendant Entities repeatedly prepared and affirmed the accuracy of data in the pro formas and other documents that they knew to be false and/or they omitted material facts. Unfortunately, Plaintiffs would not

discover the extent of misrepresentation and omission until months after submission of the applications to the USCIS, requiring attempts to revise the applications—which Defendants, and especially Defendant Shaffer, did not want to do.

101.

One of the most important representations in the pro formas was the output of each plant, which was a representation about the amount of power (expressed in megawatts) that a plant would be able to produce for sale pursuant to a PPA to generate money for a Project. This is because output would create revenues and create jobs and thus allow the Projects to meet the performance represented in the EB-5 applications. It was also crucial to profitability and thus the ability to attract the amount of investment represented in the applications.

102.

With respect to the Lumberton plant, the pro formas all assumed that the plant would be fitted with a new Andritz boiler that was crucial to achieve the necessary output and performance of that plant, within the timeframe required by the PPA and within emissions limits. The presence of the new boiler was evident in the detailed performance figures that the Defendant Entities provided in the pro formas. Although the pro formas (and the ultimate business plan and application which were also approved by the Defendant Entities) assumed the use of the new, more efficient boiler,

Plaintiffs later came to learn that the Defendant Entities had instead decided to use a less efficient, older boiler that was to be reconfigured.  The pro formas misrepresented that a new boiler would be used because the Defendant Entities knew that the older boiler would be used and nonetheless made contrary representations in both the pro formas and the application for the Lumberton Project.   This was a key misrepresentation that would materially affect the output, cost, emissions, profits, and job creation for the Lumberton Project and interfere with USCIS approval, as well as investment, based upon the application.

103.

Additionally, the Entity Defendants produced and provided pro formas for the Franklin, Georgia plant that were inaccurate and misrepresented the amount of output that could reasonably be expected from that plant.  This also would compromise the likelihood that the USCIS would approve the Project and that investors would invest in it.  The evidence suggests that the Defendant Entities (which possessed substantial experience and expertise in biofuel power generation) knowingly misrepresented aspects of that plant in the pro formas and other documents.  This is because, inter alia, an independent consulting report prepared by E3 Consulting demonstrated that the Entity Defendants knew (or at least should have known) that they had over-estimated the expected output and thus profitability of the Franklin Project.

104.

Specifically, Plaintiffs would come to learn (after submission of EB-5 applications) that the pro formas and other representations by the Defendant Entities were wrong.  Subsequent analysis and review of the E3 Consulting report indicated that misrepresentations of the parasitic load of the plant would reduce projected revenues by approximately $2.5 million; that misrepresentations about the "availability" of the plant would likely reduce projected revenues by approximately $3.2 million; and that misrepresentations about the "heat rate" of the plant would likely reduce projected revenues by approximately $1.75 million).  These material differences, alone, would significantly impact the profitability and job creation of the Project, both of which were necessary for USCIS approval and for attraction of the required amount of investment.

105.

Plaintiffs would also come to learn—after submission of the applications—that the Defendant Entities had failed to disclose known problems with the Lumberton plant that would delay its ability to comply with the requirements in the PPA for use of fuel, which the Defendant Entities knew could cause liquidated damages under the PPA and thus impact the profitability and performance of the plant.  It was not until Plaintiffs saw the Milbank diligence report in 2016 that they learned that the

Defendant Entities had known of this problem and yet failed to disclose it.  As noted

in that diligence report:

> Poultry Waste Fuel Requirement under PPA and REC Agreements of Lumberton Facility.  Lumberton PPA requires that at least 75% of the output of the Lumberton Facility must be generated using poultry waste as fuel source ("Fuel Requirement").  If the Lumberton Facility fails to comply with such Fuel Requirement, GRP is required to pay liquidated damages, and if such failure continues for 2 consecutive calendar years, Progress [power company] is entitled to terminate the PPA.
>
> We understand that compliance with Fuel Requirement will not be feasible until the boiler installation at the Lumberton Facility is completed and that such installation is expected to take up to 2 years.  However, GRP has communicated to us that commercial operations have commenced at the Lumberton Facility.  Accordingly, GIP should confirm whether GRP has obtained all necessary waiver from Progress in respect of Fuel Requirement to avoid being charged liquidated damages.
>
> Please note that Fuel Requirement is also applicable to each of the Lumberton REC Agreements.  Accordingly, GRP must also confirm whether all necessary waiver in respect of Fuel Requirement have been obtained from each REC buyer.

106.

Although this issue created great uncertainty about the Lumberton plant's

ability to operate profitably and generate anticipated revenues under the PPA, the

Defendant Entities failed to disclose it, and Plaintiffs did not learn of this fact until

after submission of the Project application.

107.

Another significant misrepresentation and omission by the Entity Defendants regarding the Lumberton Project concerned the availability of needed environmental permits. Specifically, the Defendant Entities had failed to obtain necessary permits required for phase II of the Lumberton Project. The presence of these permits was crucial in order for the Lumberton plant to operate enough to produce the output required by the PPA and by the representations in the Project's EB-5 application.

108.

Because the Entity Defendants failed to obtain the environmental permits, they were repeatedly forced to shut down the Lumberton plant because it repeatedly exceeded emissions allowed by the permits. This reduced its output and thus further compromised its ability to generate the output required for profitability and approval by the USCIS based upon the representation by the Entity Defendants in the pro formas and Project application. Plaintiffs would later learn that the Entity Defendants were aware, for months, about this shut down and its effect on the Project, yet the pro formas and other representations by the Entity Defendants did not reflect it; nor did the Entity Defendants disclose this material fact to Plaintiffs.

109.

In fact, the pending lawsuit against the Defendant Entities in a United States District Court in North Court by NRG indicates that NRG (which supplied personnel to operate the plant pursuant to a contract) had to cease work to prevent violation of the applicable environmental permits, over the Defendant Entities' objection.

110.

These and other misrepresentations and omissions occurred throughout the Defendants' communications with Plaintiffs about the Projects, as recited by the communications referenced below in Count I and incorporated into other Counts of this Complaint.

## IV.   CAUSES OF ACTION.

### COUNT I
### (RICO 18 U.S.C. § 1962(c))

111.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 of this Complaint.

112.

The Entity Defendants are collectively an enterprise engaged in and whose activities have affected interstate commerce.  The Individual Defendants are employed by and/or associated with the enterprise.

113.

The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

114.

The enterprise involved making fraudulent statements and other material misrepresentations and omissions that were intended to induce other persons and entities, including Plaintiffs, into investing in and/or seeking investment in the Projects, through EB-5 financing and other means of financing.

115.

The enterprise included efforts to obtain financing for the Projects before Defendants' engaged Plaintiffs, and the enterprise has continued after the enterprise terminated its relationship with Plaintiffs, as evidenced by Defendant Shaffer's March 29, 2016 letter, mailed and emailed to Plaintiffs, which advised that Defendants were moving on to yet another, third-party provider of investment financing for the Projects.  (*See* Exhibit "E".)

116.

The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

117.

The Individual Defendants' conducted and participated in the enterprise via fraudulent interstate mail, email, and telephone calls, which is consistent with the fact that the enterprise related to large power plants located in Georgia and in North Carolina, and entities and persons located in Alabama, Georgia, North Carolina, South Carolina, and the Southeastern United States.

118.

The Individual Defendants' participation in interstate communications made in furtherance of the enterprise is evidenced in the communications attached as Exhibits "A - G" (to the Complaint) as well as by the following communications (all of which are hereby incorporated by reference):

a. On February 23, 2015, Defendant Shaffer sent an email to Nikki Weiner and Nic Applegate, agents of Plaintiffs, copying Defendant Bean, regarding information needed for preparation of the EB-5 applications for the Projects, in which he acknowledged that Defendants had recently

provided Plaintiffs with "copies of the pro formas for all 4 plants" and suggested that Plaintiffs should use them as a basis for information regarding the applications for the Projects.  (*See* Exhibit "H.")

b.      On February 23, 2015, Nic Applegate, on behalf of Plaintiffs, sent an email to Defendant Bean regarding the status of the EB-5 applications for the Projects in which he noted delays and difficulty in obtaining accurate information from GRP and others for those applications.  (*See* Exhibit "I.")

c.      On February 23, 2015, Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Defendant Bean and Defendant Shaffer that included an attached checklist regarding the status of the applications for the Projects and that identified certain discrepancies regarding data for the Projects needed for the related applications.  (*See* Exhibit "J.")

d.      On February 24, 2015, Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Defendant Bean and Defendant Shaffer that circulated a checklist of issues to be addressed regarding the applications for the Projects.  (*See* Exhibit "J.")

e.      During February 2015, Nic Applegate had numerous interstate phone calls on behalf of Plaintiffs with Defendant Bean regarding the accuracy

of data on pro formas that Defendants had provided for the Lumberton plant.  During those calls, Defendant Bean acknowledged those pro formas and assured Mr. Applegate that the pro formas were accurate and up to date.

f.   In May 2015, Defendants caused a detailed pro forma to be sent to Plaintiff Gate Industries for the purpose of completing the economic report for the Lumberton Project.  This pro forma contained inaccurate data about the Lumberton Project, including but not limited to misrepresentations about the output, permitting, boiler and other equipment, and fuel regarding the Lumberton plant.

g.   On July 21, 2015, Defendant Kuehr sent an email to Plaintiff Gate Industries that included another detailed pro forma (dated June 30, 2015) to be sent to Plaintiff Gate Industries to use as a basis for creating the EB-5 applications for the Projects.  This pro forma also contained inaccurate data about the Lumberton Project, including but not limited to misrepresentations about the output, permitting, boiler and other equipment, and fuel regarding the Lumberton plant.

h.   On July 21, 2015, representatives of Plaintiffs and the Entity Defendants exchanged interstate emails in which even Defendant Kuehr questioned

the need to revise the applications for the Projects to reflect revised financial data, after Defendant Shaffer suggested that the applications did not need to be revised.  That evening, Defendant Shaffer sent an email to recipients including Defendant Kuehr, Nic Applegate, and Nikki Weiner (an employee of Plaintiff Gate Industries); Shaffer responded to a prior chain of emails discussing how to address the revised financial data and stated, "We don't need to change the EB5 representative financial model at all."  Shortly thereafter, Defendant Kuehr replied to the same group and asked, "So how do you reconcile two different models with varied assumptions which drive to different numbers for the same underlying projects?"  Ms. Weiner then replied to the same group, stating, "I want to get us all on the same page.  Jeff [Kuehr] sent me new financials to incorporate and indicated several changes to financial[s] throughout the economic impact report and business plan.  Are you saying we are OK to stick to the financials you provided us several months ago, which I also attached in my reply to Jeff [Kuehr]?"  Mr. Applegate then had a telephone conversation with Defendant Shaffer in which Shaffer directed Plaintiff Gate Industries not to revise the application documents, despite the newer, different data.

i.      On July 24, 2015, Defendants caused their legal counsel and agent, Sherman Golden, to send an email to Plaintiff Gate Industries that included yet another detailed pro forma (dated July 23, 2015) to be used as a basis for creating the EB-5 applications for the Projects. This pro forma also contained inaccurate data about the Lumberton Project, including but not limited to misrepresentations about the output, permitting, boiler and other equipment, and fuel regarding the Lumberton plant.

j.      On August 3, 2015, Defendant Kuehr sent an email to persons including Defendant Shaffer, as well as Lowell Elliott, on behalf of Plaintiffs, that included a detailed list of information needed for, and outstanding tasks to be done for, the applications for the Projects. (*See* Exhibit "K.")

k.      On August 3, 2015, Defendant Kuehr sent an email to Nic Applegate and Nikki Weiner, responding to issues listed in the email referenced in the preceding paragraph of this Complaint. (A copy of this email is included in the chain of emails in Exhibit "K.")

l.      On August 5, 2015, Nikki Weiner, on behalf of Plaintiffs, sent an email to persons including Dennis Carroll of Defendant GreenFuels and Defendant Georgia Renewable Power; Defendant Shaffer; and

Defendant Kuehr, in which she addressed concern about Defendants' continuing failure to provide promised information that was then urgently needed in order to prepare accurate applications for the Projects. (A copy of this email is included in the chain of emails in Exhibit "L.")

m.  On August 6, 2015, Defendant Shaffer sent an email to others including Dennis Carroll, Nikki Weiner, and Nic Applegate, in which Defendant Shaffer acknowledged the issues raised in the email identified in the preceding paragraph of this Complaint. (A copy of this email is included in the chain of emails in Exhibit "L.")

n.  On August 10, 2015, Nikki Weiner, on behalf of Plaintiffs, sent an email to Defendant Kuehr, in which she expressed concern about accurately describing the jobs to be created by the projects, given that revised data suggested a decrease in the number of jobs that were supposed to have been created by the Projects. (A copy of this email is included in the chain of emails in Exhibit "M.")

o.  On August 11, 2015, Defendant Kuehr sent an email to persons including Nikki Weiner, Nic Applegate, Lowell Elliott, Dennis Carroll, and Defendant Shaffer. In this email, he forwarded an earlier email identifying issues about the accuracy of being provided for the

applications for the Projects and recommended to Defendant Shaffer that they should therefore revise certain reports for the Projects, as well as recognizing other outstanding issues regarding the provision of complete and accurate information to Plaintiffs about the Projects.  On August 12, 2015, Defendant Kuehr forwarded that email to Defendant Shaffer, with a comment recommending revising project reports.  Defendant Shaffer responded by email on August 12, 2015, which response was forwarded by Defendant Kuehr to Nic Applegate, Nikki Weiner, and Defendant Shaffer.  (Copies of these emails are included in the chain of emails in Exhibit "M.")

p.   In early August 2015, Nic Applegate, on behalf of Plaintiffs, had an interstate telephone conversation with Defendant Bean and Defendant Kuehr to discuss Plaintiff Gate Industries' continuing concerns about the accuracy of data being provided for inclusion in EB-5 application materials for the Projects—especially proof that Projects would in fact be able to accurately support the representations of power output, job-creation, and profit that were being made in the EB-5 applications  for the Projects.  During that call, Defendant Bean assured Mr. Applegate that the data was "on track" and "looking great."  Because of his

concerns, Mr. Applegate requested an in-person meeting with Defendant Kuehr to review the EB-5 documents for accuracy.

q.  During August 2015 and September 2015, weekly interstate telephone calls occurred between representatives of Plaintiffs and representatives of the Entity Defendants (principally Defendant Kuehr) during which he repeatedly confirmed the accuracy of the pro formas that the Defendants had provided to Plaintiffs regarding the Projects.

r.  On August 17, 2015, Defendant Kuehr sent an email to persons including Defendant Shaffer, Dennis Carroll, Nic Applegate, and Lowell Elliott, in which he requested copies of certain agreements regarding the Projects, which was one of many opportunities that Defendants had to recognize that certain facts and information contained in those agreements (previously provided by Defendants) were not consistent with facts presently known to Defendants.  (A copy of this email is included in the chain of emails in Exhibit "N.")

s.  On August 31, 2015, Defendant Shaffer and Defendant Kuehr approved the draft business plan for the Lumberton Project, even though that plan was later found to have inaccuracies that Defendants knew or should

have known, with respect to matters including the output of the plant (stated to be at 40 megawatts), its costs, job creation and profitability.

t.    On September 2, 2015, Defendant Kuehr sent an email to Nic Applegate and others acting on behalf of Plaintiffs, regarding the scheduling of a telephone conference call with Defendant Shaffer, at which the parties would address continuing, open issues regarding information needed for the EB-5 applications for the Projects.  (A copy of this email is included in the chain of emails in Exhibit "O.")  Within a week of this email, the parties engaged in one of many interstate telephone calls made between agents of Plaintiffs and agents of Defendants during which Defendants continued to discuss and supply data for the applications for the Projects, much of which was inaccurate and thus misstated the profitability and job-creation of the Projects.

u.    On September 7, 2015, Nic Applegate, acting for Plaintiffs, sent emails to a person at Capital Peak Asset Management, in which he provided information about, and sought interest in providing investment financing for, the Projects for Defendants.  On September 21 2015, at 2:41 p.m., Mr. Applegate forwarded this information to Defendant Kuehr as part of Plaintiffs' continuing efforts to assist Defendants with obtaining needed

financing and investment in the Projects. (Copies of these emails are included in the chain of emails attached hereto as Exhibit "P.")

v. On November 8, 2015, Defendant Kuehr sent an email to persons including Defendant Shaffer and Nic Applegate, discussing a need for updated information for information reported in a report contained in an EB-5 application for one of the Projects, in which Defendant Kuehr also acknowledges work by Mr. Applegate, on behalf of Plaintiffs, to obtain investment financing for the Projects from a specific funding source. (*See* Exhibit "Q.") (Despite these and other continuing communications regarding Plaintiffs' difficulty obtaining accurate data regarding the Projects, Defendant Shaffer ultimately chose not to incur the relatively minor costs associated with having professionals assisting with the Projects revise their reports so that the applications would be accurate.)

x. On December 21, 2015, Defendant Kuehr sent an email to persons including Nic Applegate and Lowell Elliott, which email forwarded other, recent emails regarding Plaintiffs' continuing efforts to obtain investment financing for the Projects from another source. (*See* Exhibit "R.")

y.      On January 22, 2016, Defendant Kuehr sent an interstate email regarding the Lumberton Project to various professionals working on the Projects stating:

> I have been saying for some time that the EB-5 business plan for phase II is out of sync with our strategy. Specifically the plan describes a scenario where we are installing a new Andritz boiler at a cost of something like $80MM.  This spend is driving jobs per the economic report.  When you assume we are no longer intending to install the new boiler but rather have Foster Wheeler modify the existing boilers, there is a significant reduction in the spend and likely the related jobs.  Don't see how we can source EB-5 investors unless we depict the proper program.  I agree with you that this will need to be trued up at some point.  Seems odd to go to market describing once scenario when reality we intend to execute on another.  Am I missing something?

This email clearly recognizes that the Entity Defendants had in fact decided not to purchase a new boiler for the Lumberton plant, despite the many pro formas that they had previously provided to Plaintiffs that assumed a new boiler would be used.  (Plaintiffs did not know this until after submission of the Lumberton EB-5 application to the USCIS, based upon the Entity Defendants' approval of the Lumberton application which contained figures and information based largely on prior representations that a new boiler would be used.)

z.      On January 31, 2016, Nic Applegate sent a letter by mail and email to Defendants, addressed specifically to Defendant Bean, in which Mr. Applegate (again) stressed the importance of having complete and accurate information reported in the applications for the Projects and concerns about Plaintiffs' continuing inability to obtain such information from Defendants.  (*See* Exhibit "G.")

aa.     On February 18, 2016, Defendant Kuehr, on behalf of the Entity Defendants, sent copy of a "bank book" (dated January 4, 2015) to Nic Applegate and Lowell Elliott (who were previously unaware of that book or its contents) as an attachment to an interstate email (which references a recent and related interstate telephone conversation) and stated as follows:

> Nic – just to confirm, Dan Sherman [counsel for the Entity Defendants] and I are planning to travel to Greenville on Tuesday, 2/23.  We are departing Birmingham at 8:30 ET for a 50 minute flight to the downtown airport.  I would predict we will be to your office by no later than 10:00 ET. We are expecting a 3 hour working session.  Per our phone conversation, the attached Lumberton bank book should help you and Lowell get up to date on this project.  I will work to pull together information relative to Madison and Franklin that will help us in our discussion.  Thanks.

The referenced "bank book" further demonstrated the misrepresentations that Defendants had made regarding the Lumberton Project because it

indicated that the Defendant Entities had been aware, when making these misrepresentations, that (i) the Lumberton plant was rated as having an output of only 25 megawatts (more than 10 megawatts less than Defendants had repeatedly represented, including in the Lumberton EB-5 application documents that they had approved), and (ii) that Defendants had previously decided not to purchase and use a new boiler as had been represented to Plaintiffs during and even after the submission of the Lumberton application that represented the performance of the plant based on the use of a new boiler that would increase the plant's output, profitability, and job creation as needed for USCIS approval.

bb. On February 22, 2016, Defendant Kuehr sent an email to persons including Defendant Shaffer, Defendant Bean, Lowell Elliott, and Nic Applegate (which included another earlier email sent to Defendant Kuehr) regarding continuing efforts to obtain complete and accurate information for applications for the Projects.  (*See* Exhibit "S.")

cc. On March 29, 2016, Defendant Shaffer directed that a letter signed by him, on letterhead identifying him as President and Chief Operating Officer of Defendant Georgia Renewable Power, LLC, which Defendant Shaffer sent expressly on behalf of Defendant "GreenFuels Energy, LLC

and Affiliates," by email, to persons including Nic Applegate, Defendant Bean, and Defendant Kuehr.  In that letter, as described earlier in this Complaint, Defendant Shaffer attempted unilaterally to terminate Defendants' relationship with Plaintiffs, due to an "exclusive arrangement" that Defendants had entered into with an undisclosed third-party.  (*See* Exhibit "E.")

dd.    On April 15, 2016, Plaintiffs' counsel sent a letter to Defendant Bean reciting in detail the problems and damages that Plaintiffs had sustained because of Defendants' continuing failure to provide necessary and accurate information, which letter is incorporated by reference and which recites additional emails in which Defendants conducted their fraudulent enterprise.  (*See* Exhibit "T.")

119.

The acts of mail and wire fraud set forth above and throughout this Complaint constitute a pattern of racketeering activity, pursuant to 18 U.S.C. § 1961(5).

120.

The Individual Defendants have directly and indirectly conducted, and participated in, the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

121.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages totaling at least $9,000,000.00.  In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT II
### (RICO 18 U.S.C. § 1962(b))

122.

Plaintiffs hereby incorporate by reference Paragraphs 1-121 of this Complaint.

123.

The Individual Defendants' participated in an enterprise that involved making fraudulent statements and other misrepresentations that were intended to induce other persons and entities, including Plaintiffs, into investing in and/or seeking investment in the Projects, through EB-5 financing and other means of financing.  This enterprise included, but was not limited to, using the Entity Defendants to seek and attract investment in the Projects.

124.

The enterprise was engaged in, and its activities affected, interstate commerce.

125.

The Individual Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity, including but not limited to the fraud and misrepresentations made to Plaintiffs and others through interstate wire and mail fraud, as described above in this Complaint.

126.

The racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

127.

The Individual Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

128.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property by reasonably relying on representations about the viability, profitability, and other key aspects of the Projects, which reliance caused Plaintiffs to work exclusively for the Entity Defendants for a year (during which time Plaintiffs turned away other work and therefore lost profits), to devote money and other

valuable resources to applying for, and seeking investment in, the Projects, and to lose substantial fees and payments that Plaintiffs would have received in relation to the Projects, had the Projects been able to proceed.

129.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have suffered damages totaling at least $9,000.000.00.  In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## **COUNT III**
## **(RICO 18 U.S.C. § 1962(d))**

130.

Plaintiffs hereby incorporate by reference Paragraphs 1-121 of this Complaint.

131.

As stated above, the Individual Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

132.

The Individual Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Individual Defendants knew that their predicate acts were

part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

133.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages totaling at least $9,000,000.00.  In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT IV
## (GEORGIA RICO, O.C.G.A. § 16-14-4(a))

134.

Plaintiffs hereby incorporate by reference Paragraphs 1-121 of this Complaint.

135.

As alleged more fully above, the Individual Defendants engaged in a pattern of racketeering activity pursuant to which they engaged in multiple predicate acts, including but not limited to O.C.G.A. § 16-8-3 (theft by deception) and violations of 18 U.S.C. § 1961(1)(B) (mail and wire fraud), that have harmed Plaintiffs.

136.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of O.C.G.A. § 16-14-4(a), Plaintiffs have suffered damages totaling at least $9,000,000.00.  Plaintiffs are also entitled to treble damages and the costs and expenses associated with bringing this action, including their attorney's fees.

## COUNT V
## (GEORGIA RICO, O.C.G.A. § 16-14-4(b))

137.

Plaintiffs hereby incorporate by reference Paragraphs 1-121 of this Complaint.

138.

As alleged more fully above, the Individual Defendants engaged in an enterprise consisting of the Entity Defendants that operated in, and whose activities affected, interstate commerce.  The Individual Defendants were employed by and/or associated with the enterprise.

139.

The Individual Defendants agreed to, and did, conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, pursuant to which they engaged in multiple predicate acts, including but not limited to O.C.G.A. § 16-8-3 (theft by deception) and violations of 18 U.S.C. § 1961(1)(B) (mail and wire fraud) in violation of O.C.G.A. § 16-14-4(b).

140.

As a direct and proximate result of the Individual Defendants' racketeering activities and violations of O.C.G.A. § 16-14-4(a), Plaintiffs have suffered damages totaling at least $9,000,000.00.  In addition, Plaintiffs are entitled to treble damages and the costs and expenses associated with bringing this action, including attorney's fees.

## COUNT VI
### (Fraud)

141.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 and 118 of this Complaint.

142.

Defendants knowingly made false representations (and material omissions) to Plaintiffs in an attempt to induce Plaintiffs to work (exclusively for one year) for Defendants on the Projects, including preparation of EB-5 applications for the Projects and seeking investment funding for the Projects.  (*See* especially Paragraphs 98-110 and 118.)

143.

Defendants' false representations include misrepresentations (and material omissions) about specific aspects of the complex power plants that were part of the

Projects, such as the type of equipment to be used at the power plants, the amount of electrical power and profits that each of the Projects would produce, and the status of key personnel who were working (or continuing to work) on the Projects—including material omissions about the fact that certain key personnel had quit working for Defendants and thus on the Projects.

144.

Defendants knew or should have known that their representations to Defendants were false (and that certain omissions were omissions of material fact), when Defendants made those representations and omissions.  Among other things, this is clear from solicitations and other promotional materials from Defendants about the Projects, which repeatedly touted the vast knowledge, experience, and expertise of Defendants in the renewable power industry.

145.

Plaintiffs reasonably and justifiably relied upon Defendants' misrepresentations and omissions by, *inter alia*, working exclusively to spend time, effort, and money in pursuit of the approval and financing of the Projects, based on what Defendants' had repeatedly represented were viable and profitable projects that would allow Plaintiffs to profit from their work on the Projects.

146.

Plaintiffs have been damaged in an amount exceeding $9,000,000.00 by their reasonable and justifiable reliance on Defendants' misrepresentations, in ways that include, but are not limited to, legal and professional expenses, lost profits and opportunities, and other expenses and losses associated with Plaintiffs work on the Projects.

## COUNT VII
### (Negligent Misrepresentation)

147.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 and 118 of this Complaint.

148.

Defendants have negligently supplied information to Plaintiffs regarding and in furtherance of the Projects, including but not limited to details about the equipment at the power plants, the capacity of the power plants to produce electrical power, the profitability of the power plants, and the status of key personnel who worked on the Projects. Many of these misrepresentations, which Defendants knew (or should have known) were false, are recited above in this Complaint, and particularly in support of the RICO claims stated herein.

149.

Defendants have negligently supplied such information to Plaintiffs in an attempt to induce Plaintiffs to work, exclusively, for and with Defendants to apply for and fund the Projects.

150.

Because Defendants made negligent misrepresentations to Plaintiffs for the purpose of inducing Plaintiffs to work, exclusively, on and for the Projects, it was foreseeable to Defendants that Plaintiffs would reasonably rely upon those misrepresentations. Plaintiffs' reliance was also reasonable because Defendants repeatedly represented that they were experienced experts in the complex renewable power industry.

151.

Plaintiffs reasonably and justifiably relied upon the negligent misrepresentations made by Defendants.

152.

Plaintiffs have suffered economic injury proximately caused from their reliance upon Defendants' negligent misrepresentations.

153.

Plaintiffs' damages caused by the Defendants' negligent misrepresentations include but are not limited to lost fees, profits, and other amounts, in excess of $9,000,000.00.

## COUNT VIII
### (Breach of Contract)

154.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 of this Complaint.

155.

The Entity Defendants contracted with Plaintiffs to receive the benefit of Plaintiffs' experience, knowledge, and services in regard to the application, approval, and funding of the Projects.

156.

As the parties continued work on the Projects—advancing from the preparation of EB-5 applications for the Projects, to submitting those applications for USCIS approval, and seeking funding for the Projects—the parties memorialized the terms of their relationship by executing numerous individual contracts that, together, memorialized their agreement regarding Plaintiffs' work on the Projects.

157.

The parties' contracts include, but are not limited to, the following: (i) the four Engagement Agreements, attached as Exhibits "A"-"D", and (ii) the Term Sheet," attached as Exhibit "F" (collectively the "Breached Contacts").

158.

Pursuant to the Breached Contracts and other agreements entered into by the Parties, Plaintiffs agreed to work, exclusively, for Defendants to prepare and submit EB-5 applications for the Projects and to seek investment financing for the Projects. In return, Defendants agreed to pay Plaintiffs and to present timely and accurate information regarding the Projects which information was to be used in support of the EB-5 applications (to be made under penalty of perjury) and in support of efforts to obtain investment financing for the Projects.

159.

The Entity Defendants breached the Breached Contracts by, *inter alia*, failing to provide timely and accurate information needed for Plaintiffs to proceed with EB-5 applications for them and to seek funding for them. Instead, the Entity Defendants caused Plaintiffs unnecessary harm and expense by providing false and misleading information about the Projects.

160.

The Entity Defendants' breaches continued despite repeated warnings by Plaintiffs that timely and accurate information was crucial for the success of the Projects.

161.

The Entity Defendants' breach of the Breached Contracts has proximately caused harm to Plaintiffs, including but not limited to Plaintiffs' loss of fees, profits, and other payments that Plaintiffs should, and would, have received over the life of the contemplated Projects.  Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## **COUNT IX**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

162.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 of this Complaint.

163.

As alleged above in the prior Count VIII of this Complaint, Plaintiffs and the Entity Defendants entered into contracts including the Breached Contracts.

164.

The parties' contracts each included an implied covenant of good faith and fair dealing with regard to the negotiation and performance of those contracts.  As such,

the Entity Defendants had an implied duty to act in good faith and to engage in fair dealing under the contracts with Plaintiffs.

165.

The parties' implied covenants of good faith and fair dealing included a duty to negotiate in good faith with each other and prohibited acts in bad faith, such as any effort by the Entity Defendants make representations aimed at lulling Plaintiffs into moving forward with Plaintiffs' exclusive work on the Projects, when the Entity Defendants were in fact intending soon to unilaterally terminate the Entity Defendants' contractual relationship with Plaintiffs.  Such bad faith is actionable.

166.

Out of an abundance of caution, and in the event that Defendants argue that the Term Sheet (*See* Exhibit "F") is not a binding contract, Plaintiffs allege in the alternative that the Entity Defendants acted in bad faith by continuing to negotiate with and work with Plaintiffs, when the Entity Defendants knew that they would soon be suddenly and unilaterally ending the parties' relationship.

167.

The Entity Defendants' breaches of their duty to comply with the implied covenant of good faith and fair dealing have proximately harmed Plaintiffs in an

amount to be determined at trial.  Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## COUNT X
### (Unjust Enrichment/Quantum Meruit)

168.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 of this Complaint.

169.

Plaintiffs assert this Count X in the alternative to their claim for breach of contract made above in Count VIII.

170.

Plaintiffs provided services to and for the Entity Defendants that were valuable and that were valuable to Defendants, including but not limited to assistance with EB-5 and other financing for the Projects.

171.

The Entity Defendants requested that Plaintiffs provide these valuable services.

172.

The Entity Defendants knowingly accepted these valuable services from Plaintiffs and knowingly allowed Plaintiffs to perform these valuable services for and on behalf of the Entity Defendants.

173.

The Entity Defendants' receipt of these valuable services from Plaintiffs, without compensating Plaintiffs for such services, would be, and is, unjust.

174.

Plaintiffs expected compensation for these valuable services, at the time that Plaintiffs performed them.

175.

Plaintiffs are therefore entitled to recover from the Entity Defendants the value of these valuable services in an amount to be determined at trial.   Plaintiffs are therefore entitled to recover damages in excess of $75,000.00.

## COUNT XI
### (Exemplary Damages)

176.

Plaintiffs hereby incorporate by reference Paragraphs 1-146 of this Complaint.

177.

Based on Defendants' actions and intent with respect to Plaintiffs and the allegations stated above, Plaintiffs are entitled to recover exemplary damages from Defendants in the form of both punitive damages, pursuant to O.C.G.A. § 51-12-5.1, and treble damages pursuant to Plaintiff's federal and Georgia RICO claims stated above.

178.

Defendants' actions with respect to Plaintiffs have shown willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences.

## COUNT XII
### (Attorney's Fees)

179.

Plaintiffs hereby incorporate by reference Paragraphs 1-110 and 118 of this Complaint.

180.

Defendants have acted in bad faith, been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

181.

Plaintiffs are entitled to recover from Defendants all reasonable attorney's fees incurred by Plaintiffs in regard to this dispute, pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiffs pray:

a. That the Court enter judgment in Plaintiff's favor and against Defendants in an amount to be proven at trial for compensatory and exemplary damages, including but not limited to, punitive damages and treble damages;

b.  That Plaintiffs recover their expenses, including attorney's fees, from

Defendants;

c.  That all cost of this action be taxed against Defendants; and

d.  That the Court award such other and further legal and equitable relief as is

just and proper; and

e.  That all issues be tried before a jury.

Respectfully submitted this 1st day of June, 2017.


**LEWIS BRISBOIS BISGAARD
& SMITH, LLP**

_/s/ Thomas C. Grant_____

1180 Peachtree Street, N.E.          THOMAS C. GRANT
Suite 2900                           Georgia Bar No. 297455
Atlanta, GA  30309                   ADMIR ALLUSHI
Telephone: 404.348.8585              Georgia Bar No. 852810
Facsimile: 404.467.8845
thomas.grant@lewisbrisbois.com       *Counsel for Plaintiffs*
adi.allushi@lewisbrisbois.com

4846-7128-6089.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I served the foregoing **First Amended Complaint** with the Clerk of Court using the CM/ECF System which will automatically send electronic notification of such filing to the following counsel of record:

Mark G. Trigg

Richard Valladares

Janna Nugent

Greenberg Traurig

Terminus 200

3333 Piedmont Road, NE

Suite 2500

Atlanta, GA  30305

This 1st day of June, 2017.

**LEWIS BRISBOIS BISGAARD
& SMITH, LLP**

1180 Peachtree Street, N.E.
Suite 2900
Atlanta, GA  30309
Telephone: 404.348.8585
Facsimile: 404.467.8845
thomas.grant@lewisbrisbois.com
adi.allushi@lewisbrisbois.com

*/s/ Thomas C. Grant*
THOMAS C. GRANT
Georgia Bar No. 297455
ADMIR ALLUSHI
Georgia Bar No. 852810

*Counsel for Plaintiffs*